**STATE of Tennessee, Appellee,**

v.

**Phillip Edward HALL, Appellant.**

Court of Criminal Appeals of Tennessee, at Jackson.

Nov. 17, 1983.

Permission to Appeal Denied by the Supreme Court March 5, 1984.

A.C. Wharton, Jr., Public Defender, James H. Bostick, John C. Dice, Asst. Public Defenders, Memphis, for appellant.

William M. Leech, Jr., Atty. Gen., Gordon W. Smith, Asst. Atty. Gen., Nashville, James Challen, Asst. Dist. Atty., Memphis, for appellee.

## OPINION

TATUM, Judge.

The defendant, Phillip Edward Hall, was convicted of armed robbery and found to be an habitual criminal. The jury fixed punishment at 10 years imprisonment for armed robbery which was enhanced to life imprisonment upon the finding that he was an habitual criminal. After considering the several issues presented for review, we conclude that the judgment must be affirmed.

We first address the issue attacking the sufficiency of the evidence. The testimony of Cleotha Jones and her brothers, Alfred Jones and Charlie Jones, established that the defendant and Harold Eugene Farris, entered their residence on the morning of September 11, 1979, and committed an armed robbery. At about 9:30 A.M., the defendant and Farris knocked on the door of Cleotha Jones. She did not answer it. About ten minutes later, after cutting the telephone wires, the two men returned. The defendant, carrying an attache case, knocked on the front door and Farris went to the back yard. Ms. Jones thought that they were telephone repairmen and let defendant in the front door. He removed a pistol from the attache case. Ms. Jones pushed the defendant's arm and ran. The defendant chased Ms. Jones and Charlie Jones, who had entered the room, chased the defendant. Farris came in the back door and held a gun on Charlie Jones. The two men then ordered Charlie Jones and Cleotha Jones back into the living room and demanded money and jewelry.

The defendant accompanied Ms. Jones up the stairs and she gave him two diamond rings, a watch, and $250 in currency. After the defendant and Ms. Jones came back downstairs, Farris went upstairs where he was shot by Alfred Jones. Farris ran back downstairs.

The defendant then took Ms. Jones back upstairs at gunpoint and ordered whoever fired the shot to come out. Linda Cooper, Alfred's girlfriend, came out and the defendant took both women downstairs and tied them and Charlie Jones with a sheet. In the meantime, Alfred Jones had left through a window and telephoned police from a neighbor's house. During the robbery, the defendant's gun was fired.

Alfred Jones saw Farris and the defendant leave the house and chased the men down the street until the police appeared and arrested them. The officers saw one of the men open the hood of a car and throw the attache case in it. The officers retrieved the attache case and found two pistols in it. The defendant had a watch, two rings and $250 in cash on his person. The watch and rings were identified as the same property given to the defendant by

Ms. Jones. Ms. Jones testified that the defendant and members of his family had attempted to persuade her not to testify.

The defendant and Harold Eugene Farris testified for the defense. They testified that they went to the Jones' residence to purchase illegal pills from Ms. Jones. She increased the price of the pills and an argument ensued. The defendant had $250 that he brought to the Jones' residence with which to buy the pills. Farris and Alfred Jones discussed trading a piece of jewelry owned by Farris for some pills. Alfred Jones went upstairs for the pills and Farris followed. Alfred shot Farris. Farris went downstairs and the defendant gave him a gun from the attache case, which Farris fired up the steps. The defendant went upstairs with Ms. Jones and came down with her and Linda Cooper. Farris and the defendant then tied up both women and Charlie Jones, cut the telephone wires, and left. According to the defense's version, no money was taken but Farris took two rings and a watch from Ms. Jones person. Farris testified that he had already pled guilty to the robbery and received a sentence of 15 years. The defendant denied that the police officers found the rings and watch on him. Contrary to the policeman's testimony, the defendant said that he had pills on his person which were obtained from Alfred Jones. He testified that he had the money before he entered the Jones' residence.

■ The jury verdict, approved by the trial judge, accredits the testimony of the State's witnesses. *State v. Hatchett,* 560 S.W.2d 627 (Tenn.1978); *State v. Townsend,* 525 S.W.2d 842 (Tenn.1975). The State is entitled to the strongest legitimate inferences which may be drawn from the evidence. *State v. Cabbage,* 571 S.W.2d 832 (Tenn.1978). The guilty verdict, approved by the trial judge, removes the defendant's presumption of innocence and clothes him in a presumption of guilt. *Anglin v. State,* 553 S.W.2d 616 (Tenn.Cr. App.1977). We find that the evidence is sufficient upon which a rational jury could be convinced of the defendant's guilt be-

yond a reasonable doubt. We must therefore overrule this issue. Rule 13(e), T.R. A.P.

■ The defendant's criminal record is extensive. The record is clear that the prior convictions of the defendant are of sufficient number and character as to place him in the habitual criminal status. The evidence under the habitual criminal count also meets the standard required by Rule 13(e), T.R.A.P.

■ In the next issue, the defendant says that the trial court improperly limited the scope of his cross examination of Cleotha Jones. In her direct testimony, Ms. Jones testified that she knew that the phone was dead when the defendants knocked on her door the first time. Cross examination revealed that she said in her pretrial statement to the police:

"I heard a knock at the door. Okay, I went and looked out the window. There were two black guys, one carrying a briefcase. I didn't answer the door at first because I didn't know who the guys were, and they walked off and went down the street. By this time I discovered the phone dead."

Further, in her cross examination, she testified that she learned the phone was dead after the men knocked on the door the first time but before they knocked on it the second time.

We see no restriction on cross examination. The inconsistency was fully developed.

■ The defendant also complains of the trial judge's comment that there were no inconsistencies. As we understand the record, the trial judge was referring to the lack of inconsistencies in the witness's testimony on direct examination and the pretrial statement that she gave to the police. The witness did not specify in the police statement when she discovered that the phone was dead; she stated only that she had discovered that it was dead at sometime prior to the time the defendant came to the door the second time. We find no merit in this issue.

In the next four issues, the defendant says that the trial court erred in granting a mistrial on the habitual criminal count, that it was error and constituted double jeopardy in retrying him and that the retrial denied him a fair trial.

The jury retired to deliberate on the habitual criminal charge at 11:50 A.M. At 12:15 P.M., the jury indicated that they wished to report to the court. At 1:00 P.M., court resumed and shortly thereafter, the jury came into court and all twelve jurors agreed that the jury was "hopelessly deadlocked."

A jury may be discharged and a mistrial declared if there is a manifest necessity requiring such action by the trial judge. *Arnold v. State,* 563 S.W.2d 792, 794 (Tenn.Cr.App.1977). The impossibility of a jury reaching a verdict has long been recognized as a sufficient reason for declaring a mistrial. *Jones v. State,* 218 Tenn. 378, 388, 403 S.W.2d 750 (1966); *Arnold v. State, supra.* Where a mistrial is declared because of manifest necessity, it is not double jeopardy to retry the defendant, even though he objected to the mistrial. *Donaldson v. Rose,* 525 S.W.2d 853, 855 (Tenn.Cr.App.1975); *United States v. Dinitz,* 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976). The granting of a mistrial is within the discretion of the trial court, and a reviewing court will not disturb that action absent a finding of abuse of that discretion. *State v. Compton,* 642 S.W.2d 745, 746 (Tenn.Cr.App.1982).

With the circumstances as above described, we cannot say that the trial judge abused his discretion in declaring a mistrial after finding that the jury was "hopelessly deadlocked." Therefore, the retrial of the defendant under the habitual criminal count was authorized. *Lay v. State,* 501 S.W.2d 820 (Tenn.Cr.App.1973). These issues are without merit.

In the next two issues, the defendant says that the court erred in granting the State's motion in limine and in allowing the State to introduce evidence adduced on the first trial and then restricting the defendant's right of cross examination. Before the second trial on the habitual criminal count, the trial judge granted a motion in limine prohibiting the defense from developing the facts pertaining to the armed robbery and facts pertaining to the indictment and offenses as set out in the habitual criminal count. The court reporter, testifying for the State, said that the defendant had testified in the armed robbery case and had admitted convictions of the eleven prior felony offenses before this triggering armed robbery offense. On cross examination, defense counsel attempted to elicit evidence from the witness that the first habitual criminal proceeding ended in a mistrial. The trial court properly sustained the State's objection. The evidence relating to the previous convictions was relevant on the issue of whether the defendant was an habitual criminal. Evidence that another jury had before it the same evidence and was unable to reach a verdict was irrelevant. We therefore hold that the motion in limine was proper and that the trial judge properly excluded evidence that the jury could not agree on a verdict at the first trial.

The defendant argues that the trial court erred in refusing to instruct the jury that he would be ineligible for parole on a finding of habitual criminality. There is no written request for such charge. The identical issue was addressed by this court in *State v. Pinkston,* 644 S.W.2d 422, 423 (Tenn.Cr.App.1982), when the court said:

"There is no merit to this issue because there was no written request for such charge, the jury should not be told the aftereffect of a verdict, *Houston v. State,* 593 S.W.2d 267 (Tenn.1980), and a person sentenced as an habitual criminal is eligible for parole consideration after thirty (30) years, T.C.A. § 40–3613."

The defendant also says that the Tennessee Habitual Criminal Statute violates the Eighth and Fourteenth Amendment provisions of the United States Constitution against cruel and unusual punishment. He cites *Solem v. Helm,* —— U.S. ——, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983).

This court dealt with the same issue in *State v. Freeman*, 669 S.W.2d 688. In that case, we said:

"Finally, the defendant insists that the Tennessee Habitual Criminal Statute is unconstitutional, citing *Solem v. Helm*, — U.S. —, 103 S.Ct. 3001 [77 L.Ed.2d 637] (1983). We first observe that *Solem* did not hold the South Dakota Habitual Criminal Statute to be repugnant to the Eighth Amendment, as cruel and unusual punishment, as insisted by the defendant. The court went no further than to hold that the South Dakota Habitual Criminal Statute was unconstitutional as applied in that particular case. In the *Solem* case, the United States Supreme Court reaffirmed its holding in *Rummel v. Estelle*, 445 U.S. 263, 63 L.Ed.2d 382, 100 S.Ct. 1133 (1980). In both cases, the defendants had been convicted only of non-violent crimes and both cases recognized that a State is justified in punishing a recidivist more severely than it punishes a first offender.

In reversing *Solem*'s conviction, the court emphasized that South Dakota's recidivist statute was more severe than that of any other state. It provided that when the defendant had been previously convicted of any three felonies, in addition to the principal felony, the sentence for the principal felony is enhanced to life imprisonment without possibility of parole. By comparison, the Texas statute, with which the court was concerned in *Rummel*, provided that upon a third conviction of any felony, the defendant's life sentence could be paroled after 12 years.

The Tennessee statute does not define an habitual criminal as one who has been convicted of any felony as did the Texas and South Dakota statutes. At least two of the three convictions, under the Tennessee statute, are required to be for a crime punishable by death, an infamous crime, or assault to commit murder, mayhem, malicious shooting or stabbing, abduction of a female, or an habitual drug offender. T.C.A. § 39–1–801. Before the defendant can be tried as an habitual criminal under the Tennessee statute, he must be charged with a fourth offense of the commission of one of the specified felonies; not all felonies will trigger the offense. *Evans v. State*, 571 S.W.2d 283 (Tenn.1978); T.C.A. § 39–1–803. Although some of the offenses specified as infamous crimes do not involve violence, the legislature has selected the crimes it obviously deems to be the most serious or those which are more likely to be repeated. The Constitution 'is made for people of fundamentally differing views ...' *Rummel supra* [445 U.S. at page 282, 100 S.Ct. at page 1143], 63 L.Ed.2d at page 396. *Rummel* recognizes that a state may generally impose harsher or milder penalties for a given crime than its sister states, according to its own notions of severity.

Habitual criminals in Tennessee are not confined for life without possibility of parole; they are eligible for parole after serving 30 years. T.C.A. § 40–28–116(b)(1). While the time frame for parole eligibility is longer in Tennessee than in Texas, four convictions are required in Tennessee while only three are required in Texas. Also, as above discussed, three of the four Tennessee convictions must be of a specified character while they need not be in Texas. We do not find that the parole provisions of the Tennessee statute must be the same as that of Texas to meet Eighth Amendment standards; especially with the other distinctions and requirements of the Tennessee statute. We hold that the Tennessee statute does not violate the Eighth Amendment to the United States Constitution."

\* \* \* \* \* \*

"We do not think that convictions under the Tennessee Habitual Criminal Statute will be constitutionally disproportionate in violation of the Eighth Amendment, except perhaps under unusual circumstances which we cannot now anticipate. *Solem* does not adopt or approve a general rule of appellate review of peni-

tentiary sentences. In footnote 16 of the *Solem* case, the Supreme Court stated:

'Contrary to the dissent's suggestions, *post,* at 2, 12, we do not adopt or imply approval of a general rule of appellate review of sentences. Absent specific authority, it is not the role of an appellate court to substitute its judgment for that of the sentencing court as to the appropriateness of a particular sentence; rather, in applying the Eighth Amendment the appellate court decides only whether the sentence under review is within constitutional limits. In view of the substantial deference that must be accorded legislatures and sentencing courts, a reviewing court rarely will be required to engage in extended analysis to determine that a sentence is not constitutionally disproportionate.'

For the reasons stated, we do not think that the *Solem* case affects the Tennessee Statute or the previous holdings of the Supreme Court regarding its constitutionality."

It results that the judgment of the trial court is affirmed.

WALKER, P.J., and JAMES C. BEASLEY, Special Judge, concur.