IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 10, 2009

## STATE OF TENNESSEE v. ANDY B. MCAMIS

**Appeal from the Circuit Court for Warren County**
**No. F-9875   Larry B. Stanley, Judge**

_____

**No. M2007-02643-CCA-R3-CD - Filed June 4, 2010**

_____

The Warren County Grand Jury indicted Appellant, Andy McAmis, for one count of aggravated assault in connection with a fight. After a jury trial, Appellant was found guilty of reckless aggravated assault. The trial court sentenced Appellant to eight years as a Range II, standard offender. On appeal, Appellant argues that the evidence was insufficient to support his conviction and to rebut his assertion of the affirmative defense of self-defense; the trial court erred in denying his motion for mistrial; and the trial court erred in admitting inflammatory photographs. After a thorough review of the record, we conclude that the evidence was sufficient and that the trial court did not err in denying the mistrial or allowing the photographs into evidence. However, there is a mistake on the judgment form identifying Appellant as a Range I offender instead of a Range II offender. Therefore we affirm Appellant's conviction but remand for correction of the judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed and Remanded.**

JERRY L. SMITH, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and J.C. MCLIN, JJ., joined.

Jean M. Brock, McMinnville, Tennessee, for the appellant, Andy B. McAmis.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Dale Potter, District Attorney General; and Lisa Zavogiannis, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## *Factual Background*

Andrew McAmis is Appellant's son. On April 29, 2004, Appellant asked Mr. McAmis to help him assault someone. Mr. McAmis refused because he was on probation and did not want to violate the terms of his probation. When Mr. McAmis refused, Appellant began hitting Mr. McAmis in the mouth and back. Around six o'clock that evening, Mr. McAmis went across the street to Tammy Hogan's house to get away from Appellant. Appellant followed Mr. McAmis to Ms. Hogan's house, and they continued to argue. Ms. Hogan told Appellant to return home and calm down.

About thirty to forty-five minutes later, Appellant began screaming across the road toward her house. Mr. McAmis did not leave Ms. Hogan's house after he initially arrived. Appellant came back to Ms. Hogan's house and began to argue with Mr. McAmis. Appellant grabbed Mr. McAmis by the hair and hit him in the jaw. Ms. Hogan and another individual at her house confronted Appellant, and he returned to his house. Appellant threatened to cause Mr. McAmis to violate his probation. Appellant also threatened Ms. Hogan and her children "if [she] got in his way." Ms. Hogan called the police twice during the night. Mr. McAmis left Ms. Hogan's house and told her he was not going to return home. Sometime after eight o'clock, Appellant returned to the sidewalk in front of Ms. Hogan's house and screamed for his son. Ms. Hogan informed Appellant that Mr. McAmis was no longer there. Ms. Hogan called her father-in-law to come to her house because of the threats made by Appellant.

Mrs. Susan McAmis was married to Appellant but at the time of the trial was separated from him. She and Appellant went to search for Mr. McAmis in the housing projects. About ten thirty or ten forty-five that evening, they knocked on the door of a friend's apartment, but no one answered the door. A neighbor, Ricky Nunley, told them that the friend was not home at that time. Mr. Nunley invited Appellant and Mrs. McAmis into his home. Mrs. McAmis took the cordless telephone outside to call the police to help look for Mr. McAmis. While she was outside, she heard a "boom" inside the apartment. When she got off of the telephone, she left to meet the police who were coming to her house to help look for Mr. McAmis. She left without her husband.

Mr. Nunley had been home most of the day with his friend, Johnny Moore. Between nine and ten that evening, the victim, Lynn Judkins, arrived at Mr. Nunley's house. The victim asked Mr. Nunley if he could lie down in the bedroom. The victim was in the bedroom when Appellant arrived. Although Mr. Nunley invited Appellant into his home, he did not know either Appellant, Mrs. McAmis, or Mr. McAmis at that time. Mr. Nunley let

Mrs. McAmis use the cordless telephone. She took the telephone outside to make her call. Mr. Moore left Mr. Nunley's apartment about this time.

Shortly thereafter, the victim came into the living room. Mr. Nunley heard Appellant ask the victim if he had seen Mr. McAmis. Mr. Nunley witnessed a brief conversation between Appellant and the victim that quickly intensified. Mr. Nunley saw Appellant hit the victim. According to Mr. Nunley, the victim did not intimidate or threaten Appellant before Appellant hit the victim. Appellant was larger than the victim, and the fight was "pretty one-sided." The victim was seated on the couch in the living room when the fight began. Mr. Nunley told them to stop fighting, but he got no response. Throughout the fight, Mr. Nunley did not see the victim attempt to defend himself. Mr. Nunley opined that the victim was basically incapacitated. Mr. Nunley went to a neighbor's house to call 911. When he returned, Appellant and his wife were gone, and the victim had gotten up and moved to a chair that was very close to the couch. The victim sustained injuries to his face and head. He was bleeding profusely. The victim was taken from the scene by an ambulance. Mr. Nunley's couch was stained with blood as a result of the fight.

Sergeant Marty Cantrell, with the McMinnville Police Department, was called to the scene to investigate. When he arrived, the victim had already been taken away. Sergeant Cantrell was called to the Warren County Jail later that evening because Appellant had come to the sheriff's office to inquire about a warrant for either himself or someone else. Sergeant Cantrell asked the officers to detain Appellant. There was an altercation between Appellant and the officers, and Appellant had to be restrained. When Sergeant Cantrell arrived at the jail, he noticed that Appellant had no visible injuries from either the fight with the victim or his altercation with the officers. Appellant's shirt was torn. Sergeant Cantrell read Appellant his Miranda rights and asked him what had happened with the victim. Appellant told Sergeant Cantrell that it was self-defense. At trial Appellant alleged that the victim had a knife in his pocket. However, at the interview at the jail, Appellant did not tell Sergeant Cantrell about a knife in the victim's possession. Sergeant Cantrell did not find a knife at the scene, but he acknowledged that the scene was "trashy" and it was possible that one was there and not found. Sergeant Cantrell did not interview the victim until a little over a year after the incident. After the victim was discharged from the hospital, he went to stay with relatives in Indiana. Sergeant Cantrell interviewed the victim after he returned to the area.

As a result of the injuries sustained from the incident, the victim has hearing loss, missing teeth, impaired vision, and an impaired memory. On April 29, 2004, he remembers being at Mr. Nunley's house. The next thing he remembers is waking up at the hospital. When he arrived at the hospital, the victim was treated for cuts on his face. He did not have any injuries to any other part of his body. He had a return appointment at the hospital, but he did not keep the appointment because he could not afford the doctor bills. The victim had

met Appellant before the incident but had never had a conversation with him. After being released from the hospital, the victim went to stay with family in Indiana. He was contacted by law enforcement when he returned.

Appellant testified on his own behalf. On the evening in question, Appellant was looking for his son. Mr. Nunley invited Appellant into his house. The men were discussing Appellant's son when Appellant heard someone behind him say that his son was a "punk." Appellant said he turned around toward the person and was hit in the mouth. Appellant testified that it was the victim who had hit him in the mouth. After the initial hit, they began fighting. Appellant hit the victim once or twice when Appellant saw the victim reach in his pocket. Appellant had heard that the victim could be violent, and he feared the victim was getting a knife because the victim had previously cut a man's throat. Appellant held the victim's arm because he was in fear of being stabbed or cut. After the altercation, he took the knife out of the victim's pocket and threw it across the room. Appellant testified that he had known the victim and his brothers for years because they grew up together.

The victim was recalled to the stand. He acknowledged that he had pulled a knife on a man about twenty years ago. He stated that the man in question was threatening the victim and his girlfriend. The victim stated that it was an act of self-defense. There were no criminal charges filed against the victim in connection with the incident which happened twenty years ago.

On August 6, 2004, the Warren County Grand Jury indicted Appellant for one count of aggravated assault. A jury trial was held on June 18, 2007. At the conclusion of the trial, the jury found Appellant guilty of one count of reckless aggravated assault. On September 12, 2007, the trial court held a sentencing hearing. The trial court sentenced Appellant as a Range II, standard offender to eight years.[1] Appellant filed a timely notice of appeal.

---

[1]We note that the judgment form indicates that Appellant was sentenced as a Range I, standard offender. However, at the sentencing hearing, the trial court stated that Appellant was being sentenced as a Range II, multiple offender. "[W]hen there is a discrepancy between what is reflected in the sentencing hearing transcript and what is on the judgment form, the transcript controls." *State v. Adrian Porterfield*, No. W2006-00169-CCA-R3-CD, 2007 WL 3005349, at *13 (Tenn. Crim. App., at Jackson, Oct.15, 2007) (citing *State v. Miranda Sexton*, No. E2006-01471-CCA-R3-CD, 2007 WL 596415, at *6 (Tenn. Crim. App., at Knoxville, Feb. 27, 2007); *State v. Moore*, 814 S.W.2d 381, 383 (Tenn. Crim. App. 1991), *perm. app. denied* (Tenn. July 1, 1991)).

## ANALYSIS

### Sufficiency of the Evidence

Appellant argues on appeal that the evidence was insufficient "show that the incident did not take place as [Appellant] testified and that the evidence was insufficient to dispute his claim of self-defense." The State argues that the evidence is sufficient to support the conviction.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the state. *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994); *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. *Id.* The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Harris*, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *See Tuggle*, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).

Reckless aggravated assault occurs when an individual, "Recklessly commits an assault [by intentionally, knowingly or recklessly causing bodily injury to another], and: (A) Causes serious bodily injury to another . . . ." T.C.A. § 39-13-102(a)(2). "Reckless" is defined as:

> [A] person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but

consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

T.C.A. § 39-11-302(c).

When viewing the evidence in a light most favorable to the State, the evidence presented at trial showed that Appellant attacked the victim without provocation. Mr. Nunley testified that the victim was sitting on the couch, and Appellant began hitting him. The victim never tried to defend himself against Appellant's attack. Because of the beating, the victim suffered hearing loss, missing teeth, impaired vision and impaired memory. It is clear that to inflict such extensive injuries without use of a deadly weapon is the act of someone who consciously disregarded the risk of result that would occur from the beating inflicted on the victim. Although Appellant presented another scenario, it is the purview of the jury to determine the credibility of the witnesses at trial. It is clear that the jury believed the account presented by the State's witnesses.

Appellant also argues that the State did not present sufficient evidence to rebut his presentation of the affirmative defense of self-defense. Tennessee defines self-defense as follows:

A person is justified in threatening or using force against another person when, and to the degree, the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

T.C.A. § 39-11-611(a). Self-defense requires a reasonable belief that "force is immediately necessary to protect against the other's use or attempted use of unlawful force" and that there is an "imminent danger of death or serious bodily injury" to the defendant. T.C.A. § 39-11-611(a). When a defendant relies upon a theory of self-defense, the State bears the burden of proving that the defendant did not act in self-defense. *State v. Sims*, 45 S.W.3d 1,

10 (Tenn. 2001). Further, it is well-settled that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact. *See State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). "Encompassed within that determination is whether the defendant's belief in imminent danger was reasonable, whether the force used was reasonable, and whether the defendant was without fault." *State v. Thomas Eugene Lester*, No. 03C01-9702-CR-00069, 1998 WL 334394, at *2 (Tenn. Crim. App., at Knoxville, June 25, 1998), *perm. app. denied,* (Tenn. Feb. 1, 1999)(citing *State v. Renner*, 912 S.W.2d 701, 704 (Tenn. 1995)). It is within the prerogative of the jury to reject a claim of self-defense. *See Goode*, 956 S.W.2d at 527. Upon our review of a jury's rejection of a claim of self-defense, "in order to prevail, the [Appellant] must show that the evidence relative to justification, such as self-defense, raises, as a matter of law, a reasonable doubt as to his conduct being criminal." *State v. Clifton*, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994).

In this case, the jury clearly rejected Appellant's claim of self-defense by finding him guilty of reckless aggravated assault. Therefore, as stated above, Appellant must show this Court that the evidence raises a reasonable doubt as to his conduct being criminal. Appellant has not met this burden. At trial, he testified that the victim had a knife and attempted to pull it out of his pocket. However, he testified that the victim never actually took a knife out of his pocket. Appellant stated that he took the knife out of the victim's pocket himself and threw it across the room. When the police investigated the crime scene they did not locate a knife. In addition, Mr. Nunley, the eyewitness, stated that Appellant struck the first blow and that the victim did nothing to try to defend himself. Also, Sergeant Cantrell testified when he saw Appellant at the jail a few hours later, Appellant had no injuries. Therefore, there is no evidence other than Appellant's testimony to prove that he acted in self-defense and that his behavior did not constitute reckless aggravated assault. The jury obviously rejected Appellant's account of events. We have stated above that the jury is the arbiter of the credibility of witnesses at trial. Clearly, the jury found that Appellant was not credible.

We conclude that the evidence was sufficient to support Appellant's conviction. Therefore, this issue is without merit.

### Failure to Declare a Mistrial

Appellant next argues that the trial court erred when it denied his motion for a mistrial during a witness's testimony about prior bad acts. The State argues that there was no manifest necessity for the granting of a mistrial.

The purpose of a mistrial is to correct the damage done to the judicial process when some event has occurred which would preclude an impartial verdict. *See Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). The decision whether to grant a mistrial is within the trial court's discretion and will not be disturbed absent an abuse of that discretion. *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991)(citing *State v. Hall*, 667 S.W.2d 507, 510 (Tenn. Crim. App. 1983)). For this reason, an appellate court's review should provide considerable deference to the trial court's ruling in determining whether an occurrence or event at trial has so prejudiced the defendant or the State as to preclude a fair and impartial verdict. *See State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

In determining whether there is a "manifest necessity" for a mistrial, "'no abstract formula should be mechanically applied and all circumstances should be taken into account.'" *State v. Mounce*, 859 S.W.2d 319, 322 (Tenn. 1993)(quoting *Jones v. State*, 403 S.W.2d 750, 753 (Tenn. 1966)). Only when there is "no feasible alternative to halting the proceedings" can a manifest necessity be shown. *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981).

Although Tennessee courts do not apply any exacting standard for determining when a mistrial is necessary after a witness has injected improper testimony, this Court has considered: (1) whether the improper testimony resulted from questioning by the State, rather than having been a gratuitous declaration; (2) the relative strength or weakness of the State's proof; and (3) whether the trial court promptly gave a curative instruction.[2] *See State v. Demetrius Holmes*, No. E2000-02263-CCA-R3-CD, 2001 WL 1538517, at *1-4 (Tenn. Crim. App., at Knoxville, Nov. 30, 2001); *State v. William Dotson*, No. 03C01-9803-CC-00105, 1999 WL 357327, at *4 (Tenn. Crim. App., at Knoxville, June 4, 1999). This analytical framework is helpful in the case at bar.

Prior to trial, Appellant filed a motion in limine requesting that his prior convictions not be used to impeach him during his testimony. The trial court granted the motion by written order and precluded the State from using Appellant's second degree murder conviction as impeachment evidence. At trial the following exchange occurred during the testimony of Ms. Hogan:

THE COURT:     He being the defendant went back home?

---

[2] These factors are non-exclusive and may not be pertinent in every case. *William Dotson*, 1999 WL 357327, at *4; *see Mounce*, 859 S.W.2d at 322 (holding that determination of propriety of mistrial is not subject to mechanistic determination and should be made on the facts of each individual case).

[Ms. Hogan]: He went back to his house, but they continued to scream at each other. He said he was going to violate [Mr. McAmis] [for his probation]. I told him . . . I said, there is no need of you violating him. You just need to calm down.

[State's attorney]: Did he threaten you?

[Ms Hogan]: Yes. He told me that he would kill me and my kids if I got in his way.

[State's attorney]: Did he say anything else about his history?

[Ms. Hogan]: He just said that he had killed one man before and . . .

[Defense attorney]: Your Honor, I object.

[Trial court]: Sustained. Please disregard the last statement.

At this point, Appellant's attorney requested a mistrial because of Ms. Hogan's statement. The trial court denied his request. Appellant argues on appeal that this denial was error.

We agree with Appellant that the State's question regarding what Appellant told Ms. Hogan about his history was meant to elicit testimony about Appellant's prior bad acts, specifically his prior conviction for second degree murder. However, because we conclude that the evidence was overwhelming and that the trial court immediately gave a curative instruction, we find no manifest necessity for the granting of a mistrial. As stated above, the evidence presented by all the eyewitnesses, was that Appellant began beating the victim without provocation. Mr. Nunley also stated that the victim did not attempt to defend himself and was basically incapacitated. In addition, Sergeant Cantrell stated that when he saw Appellant at the jail later that night he had no injuries. Therefore, we find no abuse of discretion by the trial court in denying Appellant's motion for a mistrial.

This issue is without merit.

**Introduction of Photographs**

Appellant final argument is that the trial court erred in admitting one photograph of the victim, all the photographs of the crime scene presented by the State, and one photograph of Appellant. The State argues that the photographs were properly admitted.

As we begin our analysis, we note well-established precedent providing "that trial courts have broad discretion in determining the admissibility of evidence, and their rulings will not be reversed absent an abuse of that discretion." *State v. McLeod*, 937 S.W.2d 867, 871 (Tenn. 1996). To be admissible, evidence must satisfy the threshold determination of relevancy mandated by Rule 401 of the Tennessee Rules of Evidence. *See, e.g.*, *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978). Rule 401 defines "relevant evidence" as being "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant "evidence may be excluded if its probative value is substantially outweighed by . . . the danger of unfair prejudice." Tenn. R. Evid. 403; *see also Banks*, 564 S.W.2d at 951.

Graphic, gruesome, or even horrifying photographs of crime victims may be admitted into evidence if they are relevant to some issues at trial and their probative value is not outweighed by their prejudicial effect. *Banks*, 564 S.W.2d at 949-51. On the other hand, "if they are not relevant to prove some part of the prosecution's case, they may not be admitted solely to inflame the jury and prejudice them against the Appellant." *Id.* at 951 (citing *Milam v. Commonwealth*, 275 S.W.2d 921 (Ky. 1955)). The decision as to whether such photographs should be admitted is entrusted to the trial court, and that decision will not be reversed on appeal absent a showing of abuse of discretion. *Id.* at 949; *State v. Dickerson*, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993).

The term "undue prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Banks*, 564 S.W.2d at 950-51. In *Banks*, the Supreme Court gave the trial courts guidance for determining the admissibility of relevant photographic evidence and determined that a trial court should consider: (1) the accuracy and clarity of the picture and its value as evidence; (2) whether the picture depicts the body as it was found; (3) the adequacy of testimonial evidence in relating the facts to the jury; and (4) the need for the evidence to establish a prima facie case of guilt or to rebut the Appellant's contentions. *Id.* at 951.

Before trial, Appellant filed a motion to suppress the photographs in question. The photographs allowed by the trial court were one photograph of the victim's injuries, one photograph of Appellant at the jail, and all the photographs presented of the crime scene. In the case at hand, Appellant argues that these photographs were gratuitous because of the testimony at trial. We disagree.

The State was allowed to present one photograph depicting the victim's injuries. While it is true that there was testimony concerning his injuries, the photograph was probative to show the extent of his injuries in light of the fact that the State had to prove

serious bodily injury. With regard to the crime scene, Appellant specifically complains about photographs depicting the blood stains on the couch. These photographs are relevant because they demonstrate that the beating occurred in one area of the couch where the victim was seated. These pictures support Mr. Nunley's testimony that Appellant was beating the victim in one area. Lastly, there is the picture of Appellant. Appellant complains that the picture depicts him in shackles. Sergeant Cantrell testified that when he arrived at the jail, Appellant was in shackles because he had gotten into an altercation with the officers. In addition, this picture is very relevant to the State's case because it shows that Appellant had sustained no injuries. This photograph was more probative than prejudicial because of Appellant's assertion that he acted in self-defense. Therefore, we conclude that the trial court did not abuse its discretion in allowing the photographs into evidence.

This issue is without merit.

## **CONCLUSION**

We affirm Appellant's conviction but remand for entry of corrected judgment.

_____
JERRY L. SMITH, JUDGE