# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### October 26, 2011 Session

## STATE OF TENNESSEE v. JOHNLINDSEY, III

### Appeal from the Criminal Court for Hamilton County
### No. 267238, 267325    Rebecca J. Stern, Judge

### No.  E2011-00052-CCA-R3-CD - Filed November 5, 2012

Appellant was indicted by the Hamilton County Grand Jury for one count of resisting arrest, for one count of vandalism over $1,000, and for one count of theft over $10,000.  At the conclusion of a jury trial, Appellant was convicted of one count of resisting arrest, one count of vandalism over $1,000, and the lesser included offense of theft over $1,000 but less than $10,000.  The trial court sentenced Appellant to an effective sentence of twelve years.  On appeal, Appellant argues that the evidence was insufficient to support his convictions of vandalism over $1,000 and resisting arrest.  In addition, he argues that the trial court erred in denying his motion to declare a mistrial.  After a thorough review of the record, we conclude that there was ample evidence to support his convictions and that the trial court did not err in denying his motion to declare a mistrial.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Lloyd A. Levitt, Chattanooga, Tennessee, for the appellant, John Lindsey, III

Robert E. Cooper, Jr., Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; William H. Cox, III, District Attorney General; and Charlie Minor, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## *Factual Background*

Appellant and his roommate, Edward Holmes, lived in Hamilton County. In September 2006, Appellant was a full-time employee at Covenant Transport. On September 7, 2006, he and Mr. Holmes went to Covenant Transport and took a cargo van. They hid the Covenant Transport logo on the side of the van using white poster board and tape. They drove to Southern Honda Powersports. When they arrived, Appellant "slam[med the van] in reverse and ram[med] the big metal grate door."

Once inside Southern Honda Powersports, they got out of the van, and Mr. Holmes got onto a motorcycle. As he was trying to move the motorcycle, Mr. Holmes's foot slipped on the tile, and the motorcycle on which he was sitting fell over. He abandoned that motorcycle and rode a different one away from the business and to the house he shared with Appellant. Once there, he waited for Appellant to arrive. Mr. Holmes parked the motorcycle in the garage. He later gave a statement to two officers that he and Appellant had stolen the motorcycle. He also identified the stolen motorcycle as a 2004 Honda CBR 1000.

David Wright is employed at Southern Honda Powersports as the parts and service director. Mr. Wright stated that after Appellant and Mr. Holmes broke into the building, the door was "knocked completely out of the frame." His estimate of the damage to the door was between $2,500 and $5,000. In addition, the motorcycle that fell while Mr. Holmes was attempting to steal it had a lever broken. It cost $500 to repair the motorcycle. The retail price of the stolen Honda CBR 1000 motorcycle was between $8,000 and $10,000. Mr. Wright also recovered the security video from the date of the incident which showed the vandalism, burglary, and theft in question.

David Rotman is the chief financial officer at Southern Honda Powersports. He was not employed by Southern Honda Powersports at the time of the incident. As chief financial officer, Mr. Rotman was aware of the incident even though it occurred before his employment with Southern Honda Powersports. He testified regarding a similar accident involving a smaller door. He stated the cost of repair for the smaller door was $1,700. Therefore, Mr. Rotman estimated that the cost to replace the door involved in the incident at hand would be $1,700 at the least.

Mr. Rotman also testified regarding the value of the stolen motorcycle. He stated that the retail price of a new motorcycle of the same type as the one that was stolen would be

$10,999. The actual motorcycle that was stolen was a low-mileage, used vehicle. Mr. Rotman estimated the price of the motorcycle as between $8,995 to $12,995.

Investigator Ty Cooper is an investigator with the Chattanooga Police Department. On December 20, 2006, he went to Appellant's house because he had received reports that there was a stolen BMW located there. Investigator Cooper found both a BMW in the driveway and a motorcycle in the garage.

On October 11, 2007, Investigator Cooper and Investigator Jeffrey Reardon, who is also an investigator with the Chattanooga Police Department, conducted a felony stop of Appellant while he was driving a black BMW. Appellant stopped but remained in the car for 30 to 40 seconds. The investigators ordered Appellant to exit the car three or four times during the 30 to 40 seconds. When Appellant finally exited the car, Appellant "reached down into his driver's side door into a side compartment on the door." In reaction to Appellant's actions, the officers took Appellant to the ground. They placed Appellant in handcuffs and informed him that he was under arrest. They placed Appellant in the back of a patrol car.

Shortly after Appellant was placed in the patrol car, his mother arrived at the scene demanding to know why her son was being arrested. The officers discovered the Appellant had managed to get his hands that had been handcuffed behind his back, in front of his body. Appellant then pried open the barrier between the front and back seats of the patrol car. Appellant was able to retrieve his wallet and cell phone from the dashboard of the patrol car. He had also managed to roll one of the patrol car windows down.

Officer Brad Brown is a police officer with the Chattanooga Police Department. He assisted in Appellant's arrest. Officer Brown testified that when Appellant stopped his car, he remained in the car and spoke on his cell phone despite repeated orders to exit his car. Officer Brown also testified that Appellant pried the barrier open in the patrol car, retrieved his wallet and cellphone, and rolled down a rear window. Officer Brown stated that after the officers discovered what Appellant had done in the patrol car, they again handcuffed Appellant, and an officer watched Appellant to make sure he did not escape.

Investigator Reardon stated that he was involved in the investigation of the burglary. He spoke with Mr. Holmes who informed Investigator Reardon that he and Appellant stole the motorcycle at Southern Power Motorsports. Mr. Holmes's version of the events of the burglary matched a recording on a security video from Southern Honda Powersports. Investigator Reardon discovered that Appellant was employed at Covenant Transport at the time of the burglary. Investigator Reardon went to Covenant Transport to inspect their cargo

vans. He stated that when he viewed the vans, he discovered that the Covenant Transport vans had the same distinctive bumper as that of the van used in the burglary.

Investigator Reardon also testified about Appellant's arrest. He stated that after the officers stopped Appellant, he refused to comply with Investigator Reardon's repeated verbal commands. When Appellant finally exited the car, he reached for something in the car. The officers "did a takedown" on Appellant because of this action on his part. Appellant struggled with the officers, and "they had to wrestle with him just for a minute to get his arms up behind his back and cuff him behind his back." Investigator Reardon testified that Appellant squirmed on the ground as if he was trying to crawl away. He stated that the officers had to use force to handcuff Appellant's hands behind his back and to take him into custody.

Appellant's ex-wife, Tameka Sims, testified that the physique of the perpetrator portrayed in the security camera video matched that of Appellant. She also testified that the Tommy Hilfiger blue jeans worn by the perpetrator matched a pair of blue jeans owned by Appellant.

The owner of Southern Honda Powersports, Timothy Kelly, testified that he was the owner of the business on September 7, 2006, and he did not give anyone permission to enter his business on the date in question.

John Hamrick is the facilities manager at Covenant Transport and was employed as such on September 7, 2006. He stated that Appellant performed maintenance for Covenant Transport at both their hotel and training facility. Mr. Hamrick stated that Appellant would have had the keys and, therefore access, to the hotel and training facility. The Covenant Transport vans were not to be used after work hours for any reason. Mr. Hamrick did not allow Appellant to use the Covenant Transport vans for personal use.

Appellant also presented evidence at the trial. Glenn Ford stated that he had known both Appellant and Mr. Holmes for twenty years. Mr. Ford testified that he saw Mr. Holmes driving a motorcycle similar to the one that was stolen from Southern Power Motorsports. Mr. Ford stated that Mr. Holmes told him that he had gotten the motorcycle from a friend who lived in Nashville and had to go to Iraq.

Reeshonda Witherow also testified at the trial on behalf of Appellant. She stated that Appellant is the father of her two children. Because Ms. Witherow worked the second shift from 2:00 p.m. to 10:00 p.m., Appellant would keep their children while she was at work. She stated that they established this routine when their son was born in November 2004. On September 7, 2006, Ms. Witherow's payroll history showed that she worked from 1:51 p.m.

to 9:58 p.m. She stated that the children usually stayed at Appellant's mother's house. The drive time between Ms. Witherow's place of employment and Appellant's mother's house was about twenty-five minutes. However Ms. Witherow could not specifically remember what happened on the date in question.

Appellant's neighbor, Pam Craven, also testified at trial. She stated that she knew that Mr. Holmes and Tameka Sims were living with Appellant. She identified several photographs of Appellant and Mr. Holmes in front of Appellant's house.

Following Appellant's arrest on October 11, 2007, the Hamilton Grand Jury indicted Appellant on February 13, 2008, for one count of resisting arrest; and on February 20, 2008, for one count of vandalism over $1,000 and one count of theft over $10,000.

At the conclusion of the jury trial held in July 2010, the jury found Appellant guilty of resisting arrest, vandalism over $1,000, and the lesser included offense of theft over $1,000 but less than $10,000. The trial court sentenced Appellant to an effective sentence of twelve years.

## ANALYSIS

### Sufficiency of the Evidence

Appellant's first issue on appeal is that the evidence was insufficient to support his convictions of vandalism over $1,000 and resisting arrest. Appellant does not dispute that the evidence was sufficient to support his conviction for theft between $1,000 and $10,000. The State argues that the evidence was sufficient to support his convictions.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994); *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. *Id.* The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Harris*, 839 S .W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences

that may be drawn therefrom." *See Tuggle*, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Vandalism

Appellant argues that the State did not present sufficient evidence to prove that the value of the door that was damaged during the burglary was over $1,000.

Tennessee Code Annotated section 39-14-408(a) states that a person who, "knowingly causes damage to or the destruction of any real or personal property of another . . . knowing that the person does not have the owner's effective consent . . ." is guilty of vandalism. Under Tennessee Code Annotated section 39-14-408, damage is "destroying, polluting or contaminating property." Acts of vandalism "are to be valued according to the provisions of § 39-11-106(a)(36) and punished as theft under § 39-14-105." T.C.A. § 39-14-408(c). Tennessee Code Annotated section 39-11-106 provides definitions for criminal offenses. Specifically, Tennessee Code Annotated section 39-11-106(a)(36) defines "[v]alue" as follows:

(A) Subject to the additional criteria of subdivisions (a)(36)(B)-(D), "value" under this title means:

(I) The fair market value of the property or service at the time and place of the offense; or

(ii) If the fair market value of the property cannot be ascertained, the cost of replacing the property within a reasonable time after the offense;

Tennessee courts have previously allowed the value of the cost of repairs to determine the value of vandalized property. *State v. Kenneth Edward Watts*, No. E2010-00553-CCA-R3-

CD, 2011 WL 5517000, at \*3 (Tenn. Crim. App., at Knoxville, Nov. 8, 2011), *perm. app. denied*, (Tenn. Mar. 7, 2012); *see also State v. Jimmy Dewayne Lentz*, No. M2006-01774-CCA-R3-CD, 2007 WL 2350102, at \*3 (Tenn. Crim. App, at Nashville, Aug. 13, 2007); *State v. Nona Pilgram*, No. E2004-00242-CCA-R3-CD, 2005 WL 602380, at \*5 (Tenn. Crim. App., at Knoxville, Mar. 14, 2005).

At the trial, Mr. Rotman testified that a smaller door to Southern Power Motorsports was damaged in a similar way to the door involved in the incident in question. He testified that the repair cost for the smaller door was $1,700. As stated above,Tennessee Code Annotated section 39-11-106(a)(36)(A)(ii) provides that, the cost of replacing property can be used to ascertain the fair market value. We conclude that a reasonable trier of fact could conclude that the cost to replace a larger door would be more than $1,700 and, therefore, would cost more than $1,000 to replace. In addition, Mr. Wright, who is employed in the parts and service department of Southern Honda Powersports estimated that the damage to a larger a door would be between $2,500 and $5,000.

Appellant argues that one way in which the evidence was insufficient is that there was no proof that the door was actually repaired or was repaired on a permanent basis. However, the statute does not require the actual repair or replacement of the damaged item to meet the elements of vandalism, only that the cost of repair or replacement be established.

When the evidence is taken in the light most favorable to the State, we conclude that the evidence is sufficient to show that the value of the door was more than $1,000 and sufficient to support Appellant's conviction of vandalism over $1,000.

Resisting Arrest

Appellant also argues that the evidence was insufficient to support his conviction for resisting arrest. He argues that the State did not prove that force was used against an officer and that the officers actually involved in the arrest of Appellant were not presented. The State argues that the evidence is sufficient to support the conviction.

Tennessee Code Annotated section 39-16-602 sets out the elements of resisting arrest. That statute states:

It is an offense for a person to intentionally prevent or obstruct anyone known to the person to be a law enforcement officer, or anyone acting in a law enforcement officer's presence and at such officer's direction, from effecting

> a stop, frisk, halt, arrest or search of any person, including the defendant, by
> using force against the law enforcement officer or another.

T.C.A. § 39-16-602(a). Force is defined as "compulsion by the use of physical power or violence and shall be broadly construed to accomplish the purposes of this title." T.C.A. § 39-11-106(a)(12).

At trial, Investigator Reardon testified that the officers stopped Appellant in a felony stop. Investigator Reardon repeatedly ordered Appellant to get out of his car. When Appellant finally got out of the car, he reached for something in the compartment on the driver's side door. At this point, the officers proceeded to "take Appellant down." According to Investigator Reardon, the officers struggled with Appellant in an attempt to get his hands behind him so they could put handcuffs on him. Investigator Reardon also stated that Appellant was squirming on the ground, as if he was trying to crawl away from the officers. As stated above, Appellant argues that this does not constitute force as contemplated by the statute.

When this Court has previously addressed this issue, we have held that similar behavior on the part of the defendant constitutes force as required for a conviction of resisting arrest under Tennessee Code Annotated section 39-16-602. *State v. Tamabe Trinise Leke*, No. W2009-02583-CCA-R3-CD, 2010 WL 4054320, at *6 (Tenn. Crim. App., at Jackson, Oct. 15, 2010) (upholding resisting arrest conviction where the defendant pulled away from officer "three good times with all her might" and held hands under stomach while lying on the ground); *State v. Mary Margaret Boyd*, No. M2004-00580-CCA-R3-CD, 2005 WL 885091, at *3 (Tenn. Crim. App., at Nashville, Apr 15, 2005) (upholding resisting arrest conviction where the defendant became belligerent and "wallowed around all over the ground" and twisted, turned, and pulled away"); *State v. Lawrence Ralph, Sr.*, No. M2004-02293-CCA-R3-CD, 2005 WL 2043675, at *5 (Tenn. Crim. App., at Nashville, Aug. 25, 2005), *perm. app. denied*, (Tenn. Feb. 6, 2006) (upholding resisting arrest conviction where the defendant grabbed steering wheel of car, had to be forcibly removed from car, and struggled on the ground with police); *State v. Timothy Wayne Grimes*, No. M2001-02385-CCA-R3-CD, 2002 WL 1885053, at *4 (Tenn. Crim. App., at Nashville, Aug. 16, 2002), *perm. app. denied*, (Tenn. Dec. 23, 2002) (upholding resisting arrest conviction in which defendant locked his arms, threw his arms back and "bowed up" on police as they attempted to arrest him); *State v. Ronald David Lee*, No. 03C01-9410-CR-0039, 1995 WL 395840, at *5 (Tenn. Crim. App., at Nashville, July 6, 1995) (upholding conviction where officer had to wrestle defendant in an attempt to handcuff him).

In light of this Court's previous holdings and viewing the evidence in a manner most favorable to the State, we conclude that the evidence is sufficient to support Appellant's conviction for resisting arrest.

Therefore, this issue is without merit.

## **Mistrial**

Appellant also argues that the trial court erred in overruling his Motion to Declare a Mistrial which was prompted by the testimonies of Mr. Holmes and Investigator Reardon. The State argues that the trial court did not err.

At the beginning of the trial, the attorneys and the trial court had a hearing to determine to what Mr. Holmes could testify regarding the prior criminal history he shared with Appellant. At the conclusion of the hearing, the trial court determined that Mr. Holmes could not testify about any offenses in which he and Mr. Holmes participated outside of the offense for which Appellant was on trial. Mr. Holmes was present at this hearing and the ruling was made clear to him as well as attorneys for both sides.

During Appellant's cross-examination of Mr. Holmes, Appellant's counsel brought out all of Mr. Holmes's criminal history. Many of these incidents were those that involved Appellant. Mr. Holmes did not mention Appellant's participation in the incidents about which he was questioned. However, Appellant's counsel asked questions about the acquaintance between Mr. Holmes and Appellant and the following exchange occurred:

> [Appellant's counsel]: Okay. Let's see, let me go back to [Appellant's] how you struck up or got back acquainted. You knew each other a long time ago, you belonged to a car club and that was when you were, what, about 18 years old –
>
> [Mr. Holmes]: That's correct. And then [Appellant] went off to the penitentiary. And then –
>
> [Appellant's counsel]: Judge, I'd ask the Court to instruct –
>
> The Court: All right. The jury should disregard any comments along those lines. We're here about his case.

Appellant asked another question and asked to approach the bench. While at the bench, Appellant's attorney voiced a concern that an instruction to the jury was not sufficient. The trial court replied that Appellant's counsel had asked the question, not the State, and that the answer was in response to the question asked by counsel. The trial court admitted that the statement was close to crossing the line, and the court suggested that Appellant's counsel lead more in the questioning of Mr. Holmes. There were no further issues with Mr. Holmes's testimony in this regard.

The next incident which is the basis of this issue occurred during the direct examination of Investigator Reardon. Appellant's counsel was asking Investigator Reardon about his investigation into Appellant's participation in the theft of the motorcycle. The following exchange followed Investigator Reardon's statement that he saw Appellant drive by and that he called a marked police vehicle to stop Appellant:

[The State]: Obviously, you stopped [Appellant], correct?

[Investigator Reardon]: That is correct, sir.

[The State]: All right. Now, what happened once [Appellant] was stopped?

[Investigator Reardon]: Well, we were going to do a felony stop on him just because of his background and everything that we got into. We looked at him, we knew he had felony charges before. We knew he –

[Appellant's counsel]: Judge, I am going to have to object. Could we approach?

At this point, the trial court held a jury-out hearing. During the hearing, Appellant requested a mistrial. He maintained that Investigator Reardon's statement about Appellant's background and previous felony charges combined with Mr. Holmes's previous statement about Appellant going to the penitentiary was sufficient to prejudice the jury and require a mistrial. The trial court pointed out that the statement by Mr. Holmes was actually elicited in response to a question posed by Appellant's counsel on cross-examination.

The trial court agreed that Investigator Reardon's statement was very close to the line but determined that a mistrial was not necessary. Investigator Reardon apologized to the trial court and stated that he did not realize that his statement might cause problem. The State told the trial court that it had informed its witnesses about the earlier ruling to avoid statements

about Appellant's previous record but admitted that it could have stressed the need to avoid such testimony more vigorously.

The attorneys and the trial court decided not to give an instruction to the jury but instead redirect the jury through questioning of the witness. The parties decided that an instruction would call attention to the fact that Investigator Reardon had mentioned prior felony charges. Therefore, Appellant's counsel formed a question for the State to ask the witness to focus the jury's attention on the felony charges that were involved in the trial. The following exchange occurred immediately after the jury-out hearing:

[The State]:   Now, Officer Reardon, I believe you were saying that you made a felony stop because these are felony charges, correct?

Investigator Reardon:      That is correct.

The purpose of a mistrial is to correct the damage done to the judicial process when some event has occurred which would preclude an impartial verdict. *See Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). The decision whether to grant a mistrial is within the trial court's discretion and will not be disturbed absent an abuse of that discretion. *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991) (citing *State v. Hall*, 667 S.W.2d 507, 510 (Tenn. Crim. App. 1983)). For this reason, an appellate court's review should provide considerable deference to the trial court's ruling in determining whether an occurrence or event at trial has so prejudiced the defendant or the State as to preclude a fair and impartial verdict. *See State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

In determining whether there is a "manifest necessity" for a mistrial, "'no abstract formula should be mechanically applied and all circumstances should be taken into account.'" *State v. Mounce*, 859 S.W.2d 319, 322 (Tenn. 1993) (quoting *Jones v. State*, 403 S.W.2d 750, 753 (Tenn. 1966)). Only when there is "no feasible alternative to halting the proceedings" can a manifest necessity be shown. *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981).

Although Tennessee courts do not apply any exacting standard for determining when a mistrial is necessary after a witness has injected improper testimony, this Court has considered: (1) whether improper testimony resulted from questioning by the State, rather than having been a gratuitous declaration; (2) the relative strength or weakness of the State's

proof; and (3) whether the trial court promptly gave a curative instruction.[1] *See State v. Demetrius Holmes*, No. E2000-02263-CCA-R3-CD, 2001 WL 1538517, at *1-4 (Tenn. Crim. App., at Knoxville, Nov. 30, 2001); *State v. William Dotson*, No. 03C01-9803-CC-00105, 1999 WL 357327, at *4 (Tenn. Crim. App., at Knoxville, June 4, 1999). This analytical framework is helpful in the case at bar.

Appellant argues that the statements of Mr. Holmes and Investigator Reardon necessitated the calling of a mistrial and that the trial court abused its discretion in denying Appellant's request. We have reviewed the record on appeal and conclude that the trial court did not err.

Initially, we point out, as did the trial court, that the statement uttered by Mr. Holmes was in direct response to Appellant's counsel's question about a break in the acquaintance between Mr. Holmes and Appellant. This statement was not elicited by the State, and the trial court gave a prompt curative instruction. Therefore, we do not find that this statement supports the granting of a mistrial in and of itself or in connection with any other incidents at trial.

We next evaluate Investigator Reardon's statement with regard to whether that statement alone should have supported the granting of a mistrial. It appears that the statement by Investigator Reardon was spontaneous. The State was not attempting to elicit the statement in its questioning. While by agreement of the parties, the trial court did not give a curative instruction, there was an attempt to redirect the jury's attention and rehabilitate the witness's statement.

Furthermore, the State's case against Appellant was very strong. There was testimony that the stolen motorcycle was found at his house. Mr. Holmes testified extensively about the burglary with specific details about Appellant's participation. There was a security video of the theft that was analyzed by the officers. When Mr. Holmes described the burglary, the officers stated that his description of the events matched what was shown in the security video. Appellant's ex-wife identified the other perpetrator as resembling Appellant and stated that the person in the video was wearing blue jeans exactly like a pair owned by Appellant. In addition, Appellant was employed by Covenant Transportation and had after hours access to the facilities. The van used in the burglary had a very distinctly painted bumper that matched that of the vans belonging to Covenant Transportation.

---

[1] These factors are non-exclusive and may not be pertinent in every case. *William Dotson*, 1999 WL 357327, at *4; *see Mounce*, 859 S.W.2d at 322 (holding that determination of propriety of mistrial is not subject to mechanistic determination and should be made on the facts of each individual case).

We conclude that based upon the factors set out above, a mistrial was not necessary. Therefore, the trial court did not abuse its discretion in denying Appellant's motion to declare a mistrial.

## CONCLUSION

For the foregoing reasons, we affirm the judgments of the trial court.

_____
JERRY L. SMITH, JUDGE