# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### January 8, 2013 Session

## STATE OF TENNESSEE v. TYRONE BOHANNA

**Appeal from the Criminal Court for Shelby County**
**No. 10-01849     Lee V. Coffee, Judge**

---

**No.  W2011-01273-CCA-R3-CD  - Filed May 29, 2013**

---

Appellant, Tyrone Bohanna, was indicted by the Shelby County Grand Jury in a multi-count indictment with co-defendant Brandon Harris in March of 2010.  Appellant was indicted for especially aggravated robbery, attempted second degree murder, two counts of employing a firearm during a felony, aggravated burglary, and three counts of aggravated assault. Following a lengthy jury trial, Appellant was convicted of especially aggravated robbery, reckless endangerment as a lesser included offense of attempted second degree murder, one count of employing a firearm during the commission of a felony, and three counts of aggravated assault.  Appellant was acquitted of one of the firearms charges.  At a separate sentencing hearing, the trial court determined that Appellant was a career offender.  As a result, the trial court imposed the maximum sentence for each offense and ordered consecutive sentencing after finding that Appellant had an extensive criminal history and was a dangerous offender.  Appellant received a total effective sentence of 120 years, eleven months, and twenty-nine days.  Appellant filed a timely motion for new trial which the trial court denied.  On appeal, Appellant seeks resolution of the following issues: (1) the sufficiency of the evidence; (2) the admission of evidence pursuant to the forfeiture by wrongdoing provision of Tennessee Rule of Evidence 804(b)(6); (3) the admission of recordings of telephone calls made by Appellant from jail; (4) the determination by the trial court to hold court on Sunday; (5) the denial of Appellant's motions for mistrial; (6) the admission of the testimony of Donovan Hensley; and (7) the imposition of consecutive sentencing.  After a thorough review of the record, we conclude: (1) the evidence was sufficient to support the convictions; (2) the trial court did not abuse its discretion in admitting evidence including Appellant's telephone calls, hearsay statements of Antonio Hawkins, and testimony from Donovan Hensley; (3) the trial court did not abuse its discretion in denying a mistrial; and (4) the trial court did not abuse its discretion in sentencing Appellant.  Accordingly, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and D. KELLY THOMAS, JR., JJ., joined.

Joseph S. Ozment, Memphis, Tennessee, for the appellant, Tyrone Bohanna.

Robert E. Cooper, Jr., Attorney General and Reporter, David H. Findley, Assistant Attorney General; Amy P. Weirich, District Attorney General, and Pamela Fleming, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### *Factual Background*

The incident that gave rise to the indictments herein occurred on November 21, 2008. The State alleged that Appellant, co-defendant Brandon Harris, and an unidentified third man entered a residence that was occupied by twin brothers, Antonio and Antoine Hawkins,[1] Michael Reynolds, and Johnny Morgan with the intent to commit a robbery. During the robbery, Antoine Hawkins was shot and seriously wounded.

As a result of the investigation into the incident, Appellant and co-defendant Brandon Harris were indicted by the Shelby County Grand Jury in March of 2010. Appellant was indicted for especially aggravated robbery, attempted second degree murder, two counts of employing a firearm during a felony, aggravated burglary, and three counts of aggravated assault.

### *Pretrial Hearings*

Prior to trial, the State attempted to introduce ten recordings of Appellant's jailhouse telephone calls in which the State claimed Appellant indicated his involvement in the murder of Antonio Hawkins and indicated that he was trying to influence the testimony of witnesses at trial. The State reviewed approximately 500 of Appellant's telephone calls made from the jail and narrowed the number of calls down to ten. The State sought to admit the substance of the telephone calls as admissions against Appellant's penal interest and to show guilty knowledge of the crime. The trial court determined that Appellant had no expectation of privacy with regard to the telephone calls. Further, the trial court conducted an analysis under Tennessee Rule of Evidence 404(b) to determine if the telephone calls were relevant

---

[1]For clarity, we will refer to the Hawkins twins by their first and last names.

and not unduly prejudicial. The trial court ultimately determined that certain relevant portions of the telephone calls were admissible but left Appellant the option to introduce additional portions of the telephone calls in the interest of completeness.

At a second pretrial hearing, the State sought to introduce the pretrial hearsay statements of victim Antonio Hawkins by utilizing the forfeiture by wrongdoing exception to the hearsay rule as he was murdered prior to trial.[2] In support of their motion, the trial court called Sergeant William Merritt. Sergeant Merritt testified that on the night of his murder, Antonio Hawkins was at the Sleep Inn with Tawanna Knight. Ms. Knight left the hotel to go to a residence on Pope Street; Antonio Hawkins left the hotel to go to his home on Banbury - a house that was rented by Johnny Morgan. Sergeant Hawkins was called to the Banbury address where he found a trail of blood from the kitchen leading outside to the street. The victim was not found on the street so authorities concluded that the blood outside must have come from someone else. DNA testing revealed that the blood outside matched that of Charles Townsend.

Sergeant Merritt testified that he believed someone had been arrested for the murder of Antonio Hawkins but that he did not know if Appellant had been charged with the crime. The trial court also heard the testimony of Adrian Wright, an inmate incarcerated with Appellant prior to trial. According to Mr. Wright, Appellant was "excited" and "happy" when he learned of Antonio Hawkins' murder. Appellant told Mr. Wright, "It's a done deal." Appellant told Mr. Wright details about the murder that only the killer would know.[3] At the conclusion of the hearing, the trial court determined that Antonio Hawkins's statements were admissible under the forfeiture by wrongdoing exception to the hearsay rule.

*Trial Proceedings*

At the lengthy trial, Michael Reynolds testified that he was at the home of Antonio and Antoine Hawkins on the night of November 21, 2008, at around 10:00 p.m. Antoine was studying for school at the time in the back part of the house. A fourth friend, Johnny

---

[2] Tennessee Rules of Evidence 804(b)(6) allows the admission of hearsay statements against a party whose wrongdoing was intended to and result in the unavailability of the declarant as a witness.

[3] Appellant presented testimony from a jail employee that stated Appellant and Mr. Wright were in different pods at certain points during their incarceration but that both men were housed in Pod D from July 12, 2010, until January 31, 2011. According to the jail employee, the men would have shared common areas in the pod and it would not have been impossible for them to talk to each other during their incarceration. The men could have also talked when being transported to court as inmates from all pods are grouped together for court.

Morgan, was also at the house. Mr. Reynolds was in the front room and the rest of the men were in the back of the house when someone knocked on the door. Mr. Reynolds looked out the window to see two men;. Antonio Hawkins recognized one of the men; he came to the door to let the men into the house. One of the men went to the back of the house with Antonio Hawkins, the other man remained in the front room with Mr. Reynolds. Mr. Reynolds identified co-defendant Brandon Harris as the first man through the door of the house. Mr. Reynolds saw a white Dodge Charger parked across the street from the house when the two men came inside.

According to Johnny Morgan, the two men that came to the house that night wanted to go to a club with Antonio Hawkins. Mr. Morgan followed Antonio Hawkins to the back of the house with one of the men so that Antonio Hawkins could tell his brother that he was leaving the house. Brandon Harris was one of the men that came to the door that night. Antoine Hawkins confirmed that around 9:30 or 10:00 p.m., co-defendant Harris walked into the back room where he was studying, looked around, and walked back out. He described co-defendant Harris as short, about five feet, three inches. Mr. Morgan confirmed this description of co-defendant Harris.

A second man came from the front of the house to the back of the house brandishing a pistol. He yelled "get down bitches. Ya'll know what this is." At that point, Antonio Hawkins ran from the room. The gunman followed him. Co-defendant Harris then pulled out a gun and started shooting at Antoine Hawkins. After Antoine Hawkins was shot, co-defendant Harris took his money then hit him several times with the gun. Co-defendant Harris told Antoine Hawkins he knew he had "more [money] than this." Co-defendant Harris started to walk away then turned and fired one more shot, hitting Antoine Hawkins in the arm. According to Mr. Morgan, co-defendant Harris walked up to Antoine Hawkins and exclaimed, "[w]here is that money at, bitch," before going through his pockets and taking his watch.

According to Mr. Reynolds, the man that stayed with him pulled out a pistol and told him to get on the floor. Mr. Reynolds complied with the request. While he was on the floor, he heard three or four gunshots coming from the back of the house. At some point, the man guarding the Mr. Reynolds opened the front door and let a third man into the house. The third man grabbed Mr. Reynolds by the ankles and dragged him from the front door to another room. Mr. Reynolds heard someone he thought was Antonio Hawkins try to open a door and leave. Then Mr. Reynolds heard one of the intruders tell him to "get back in there." Similarly, Mr. Morgan testified that when Antonio Hawkins initially tried to leave

-4-

the back room he returned quickly and told Mr. Morgan that Appellant had a gun and told him to "get his bitch ass back in the room."[4]

A few moments later, Mr. Reynolds heard the intruders leave the residence. Mr. Reynolds heard a car and confirmed it was the white Dodge Charger when he got up from the floor and saw that the car was gone. Antonio Hawkins told Mr. Morgan that he also saw a white Dodge Charger parked on the street and claimed it was driven by Derek Dowdy. Antonio Hawkins tried to chase the car but the intruders were gone. Antonio Hawkins returned to the house to tend to his twin brother, Antoine Hawkins, who had been shot during the incident.

Police arrived on the scene quickly. Both Mr. Morgan and Antonio Hawkins went to the police station to give statements. Mr. Morgan identified co-defendant Harris as one of the perpetrators. Mr. Morgan testified that he was "unable to 100% pick out [Appellant]" from the lineup but gave a description of the perpetrator to police. Mr. Morgan admitted that at first he told police that there were only two people involved. He then stated that Antonio Hawkins told him three people were involved. Mr. Morgan also admitted that he did not see a white Charger parked across the street. Mr. Morgan adamantly insisted that Appellant was the second person involved in the incident, claiming that he learned this information from Antonio Hawkins. According to Mr. Morgan, Appellant called Antonio Hawkins multiple times to assert that he was not involved in the crime. Additionally, Mr. Morgan claimed that Appellant's "people" came by to see Antonio Hawkins after the incident.

Antoine Hawkins testified that he talked to his brother about the incident after it happened. He understood that Appellant was trying to sell something, possibly drugs, to his brother Antonio. According to Antonio Hawkins the second perpetrator was around six feet tall and the third perpetrator was Appellant. Antonio Hawkins claimed that he saw Appellant flee in a white Dodge Charger, the same car that came by the house two or three days earlier and was driven by Derek Dowdy. Antonio Hawkins knew Derek Dowdy because Dowdy had robbed Antonio Hawkins a "long time ago."

Antoine Hawkins recalled that both he and Antonio testified at the preliminary hearing. Prior to the hearing, co-defendant Harris offered him money if he did not testify. Antonio Hawkins told Antoine Hawkins that he was positive Appellant was involved in the crime and that Appellant even called him to deny being at the robbery. Antoine Hawkins testified that he was present when his brother got a telephone call from Appellant.

---

[4]Appellant objected to the introduction of Antoine Hawkins's statements to Mr. Morgan.

Vita Zelikov, an investigator for Appellant, testified that she interviewed Antonio Hawkins prior to his murder. The two-page summary of the interview was admitted into evidence. In the interview, Antonio Hawkins stated that he met Appellant about three or four days prior to the crime. At the time, Appellant was with Derek Dowdy in a white Dodge Charger. On the night of the incident, co-defendant Harris and another man came to his house and wanted to go to a club. Co-defendant Harris pulled out a gun and started shooting. Appellant arrived and was also armed with a gun. All three men fled in a white Dodge Charger.

Detective Robert Tutt interviewed Antonio Hawkins at the scene. He described Antonio Hawkins as emotional and distressed over his brother. Antonio Hawkins informed Detective Tutt that there were three men involved in the crime and identified both Appellant and co-defendant Harris. Appellant was described as around six feet, two inches tall and was reported to have fled in a white Dodge Charger. A supplemental report prepared by Detective Tutt stated that co-defendant Harris and Appellant were the two men who walked into the back room just prior to the shooting.

All four victims identified co-defendant Harris as the gunman. Antonio Hawkins was the only person that identified Appellant as one of the perpetrators.[5] Antonio Hawkins wrote on the photographic lineup that Appellant was the man that pulled a gun and said "sit down."

Detective Christopher Kee took a written statement from Antonio Hawkins on November 23, 2008, that included a detailed account of what happened. In the statement, Antonio Hawkins identified co-defendant Harris, Appellant, and another man.

Antonio Hawkins testified at the preliminary hearing. He identified Appellant as the man that said "get back in the room." He also identified Appellant in the courtroom and claimed that he was worried about retribution from Appellant after an outburst by Appellant in the courtroom.

At that point during the trial testimony, the State introduced the audio recordings of ten telephone calls that Appellant made from jail to various persons. Appellant renewed the objection to the introduction of the telephone calls. The trial court deemed the telephone calls admissible. When Appellant testified, he attempted to explain the content of each and every telephone call. The text of the telephone calls entered into evidence is, in pertinent part, as follows:

---

[5]Antonio Hawkins did not identify Appellant in the first photographic lineup, which included an old photo of Appellant. In a second photographic lineup, which included a more recent photograph of Appellant, Antonio Hawkins was able to identify Appellant as one of the perpetrators.

November 26, 2008

[Appellant]: Where Trell[6] at, need trell to put that pistol, tell Trell to put that pistol on that boy, fuck that, tell Trell to put the pistol on that boy.

. . . .

[Other party]: I ain't seen nothing of those twins, I've been looking for their ass.

[Appellant]: They don't live in the house where their mother use to live, I live in their grandma's house across the street from over there.

[Other party]: I'm going to get on everything bro.

. . . .

[Appellant]: Throw that pistol in every mf face.

According to Appellant, he was speaking to his brother on the phone. Appellant explained that he wanted Trell to find out if Mr. Dowdy knew something about the crime because Mr. Dowdy had been convicted of doing something to the Hawkins twins in the past. Then Appellant claimed that he was not even talking about the Hawkins twins during this telephone call but another set of twins that lived in the neighborhood that may have information about the crime. Appellant claimed that the talk about the pistol referred to a pistol he took from a man named "Black."

December 25, 2008

[Appellant]: What happened to the whatacallit, the iron piece the thing we had before I left?

[Other party]: What thing?

[Appellant]: The hardware.

[Other party]: Oh the hardware, I still got that, that ain't budging, that ain't budging, I promise ya that.

Appellant explained during his testimony that in this conversation he was again referring to the pistol that he took from a man named "Black" during an altercation between Appellant and "Black."

---

[6]Appellant testified that "Trell" was his best friend that moved to Chicago.

<u>January 5, 2009</u>[7]
[Appellant]: If dude don't point me out I'll come home Wednesday.  Like I said, I got an afro now, . . . another things he's like [Appellant] I don't even know how you look, I just remember some of your facial feature[s], so he don't know how I look or nothing so I'm gonna have some glasses on and I grew my hair out, I'm gonna have some glasses on so hopefully he won't know I cut all the hair off my face, so I don't really think he's gonna know you know.

<u>January 10, 2009</u>
[Appellant]: Ain't no reason to be sweating on that . . . it's done did on that deal right now I got a trick for them I be out in 45, 30 days when I get through doing what I'm gonna do.

Appellant testified that during this conversation, Appellant was telling his mother that he was going to explain to the police that he had nothing to do with the crime by getting evidence to the police to show his innocence.

<u>January 30, 2009</u>
[Appellant]: This reminds me why I had to chill out from the get go.  I chilled out the wrong way, I just stopped everything and haunted.  Mother fucker haunted . . . but I had a relapse that's what I did, I had a relapse with a pistol. I'm gonna sell the mf when I get out though.

Appellant again explained that he was again referring to the pistol that he took from "Black."

<u>January 31, 2009</u>
[Appellant]: Call down to eleventh floor robbery squad, tell them you want to report a real crime, yeah a real crime that's all you got to do, don't tell you no kin to me.

Appellant explained that during this telephone call he wanted his family members to call the police and tell them the real person that committed the crime with Brandon Harris.  Appellant stated that he thought if the police knew it were his family members calling then they would not believe the story.

<u>February 5, 2009</u>
[Appellant]: I just need someone like that BK or that B dude . . .

---

[7]This telephone call was placed two days prior to his preliminary hearing.

[Other party]: Wait a minute say it again now.

[Appellant]: Anyone who know how to get up on that John Morgan dude . . . .

[Other party]: John Morgan, who's that?

[Appellant]: you know how they have smokers watching their door and shit, that's what they have right, they got two of them niggas over there, they got two of those niggas over there that came to court with them they cut their hair and dressed them up, you know how mother fuckers do, and I just need . . . or somebody to lure one them mf like they want them to wash their car and drop them off at Mitchell Heights with you and lure their ass downtown offer them two or three hundred dollars or something, get them full up . . . and and two or three hundred dollars probably get them to change their mother fucking story for that detective.

        . . . .

[Appellant]: John Morgan never identified me in court offer him about five or six drops.

Appellant testified that during this conversation, he was desperate and thought if he offered to pay Mr. Morgan and Mr. Reynolds to testify, they would tell the truth about who really committed the crime. Appellant thought that offering them money for their testimony would get the real perpetrators to court.

February 11, 2009
[Other party]: Man TY man I'm greasing them niggas man, you'll hear about it. But you ain't gonna hear it was me though. Ya hear me.

[Appellant]: But look I just know I need the mother fuckers greased. Greased to a . . . ya hear me?

[Other party]: Man look I got you on that big bra.

[Appellant]: It's a real game of chance baby that games a real game of chance baby you hear me?

[Other party]: Just like checkers man.

[Appellant]: I know it gonna take someone to break me, um break me out of here old school way man ya hear me. A real nigga don't' never win the game no more ya hear me?

[Other party]: I swear man.

[Appellant]: A real nigga, a real nigga is a dangerous species man you hear me?

[Other party]: I swear to God man.

[Appellant]: Man like I said man, you know what I'm saying, we playing for a whole 100 years. Now man my backs against the way ya hear me.

[Other party]: Man I'm full in to cheating.

[Appellant]: Blood in blood out ya know what I mean.

Appellant claimed that "greased" referred to having the real perpetrators of the crime arrested in a "slick" way. Appellant wanted to tell the police about the real perpetrators selling drugs without them knowing that he was behind the arrest. He denied that the term "greased" meant to kill someone. Appellant also claimed that "blood in blood out" did not mean to do physical harm to someone but meant "through thick and thin."

March 18, 2009
[Appellant]: What's Brandon's momma number.

[Other party]: She won't even answer no more, she like she's gonna write me a letter. What she told me on the phone proving you were nowhere around.

[Appellant]: She gonna live to pay, she gonna live to regret it though, she's gonna live to regret it. . . .

[Other party]: Every time I call she play up like she ain't home.

[Appellant]: She gonna live to regret it. Leave a message let her know I will be testifying against her son, if they don't cut me loose, he won't never get out no more.

-10-

[Other party]: All I'm trying to say is [Appellant], if they just cooperate with me I could tell 'em what Brandon's momma told me.

[Appellant]: I'm just trying to get you all prepared for when they call for you all and talk to 'em, I'm trying to get up on 'em, I got some more folks what I saying I'm just trying to get you prepared make sure your stories are right when they call you all . . . .

. . . .

[Appellant]: I got some people there that fixin to that fixin to help me get out.

[Other party]: Why can't you call him on his phone he don't have no time on it.

[Appellant]: Yeah he's got some time but I thought it was a minute some phone you can't call him to a certain time of night.

[Appellant]: I gonna get Kasey Katewood got a story to tell them people gonna get Katewood to tell them people, he's gonna be a witness for me too. Yeah, got people like Katewood, talk to Katewood, when I talk to these detectives. I'm just trying to . . . when they call me up there . . . I'm just trying to make sure everybody. . . . all the ducks in a roll. That's why I need to talk to Tony and Robin so they won't tell the detective something different and they think we're lying.

[Appellant]: Tony . . . It's [Appellant] man . . . you ain't never call that detectives number man . . . . I got these people that probably gonna call you all right. I told them that them young niggas they been threaten, I told you got into with them right I told them folks they threatening, they been threatening my brother and my sister-in-law to keep them from coming forward with information on me right. I told Robin was the clean up lady for them and she overheard them talking all that. Ya hear me. And Dirty Kirk Tell Dirty Kirk I'm gonna have them call him too. I need someone to bear witness that them dudes was in that White charger too. Tell Robin I gonna need her man to have her story straight man. They call this number man because they probably they them detective come on and talk to me today they can get me out in two days, they come talk to me tomorrow they can get me out in two days.

-11-

When asked about this conversation, Appellant claimed that when he stated co-defendant Harris's mother would "live to regret it" he meant that she would regret if she did not tell the truth during her testimony. Further, Appellant explained that he was not trying to influence witnesses when he talked about getting their stories "straight" but instead wanted to make sure his alibi witnesses were telling the truth about when and where they saw him.

March 24, 2009
[Appellant]: Brandon signed the paper I had cutting me loose but because that lawyer didn't show up that's the reason I didn't come home today. You know what I'm saying? Brandon signed the paper to cut me loose today with his lawyer. Brandon lawyer said he couldn't do it without my lawyer being present such and such. So is it because that lawyer didn't show up the reason why?

[Other party]: Yeah, me and Kendra sit in there and sit in there but they had called ya. . . .

[Appellant]: Im gonna give you the number 545 . . . . No fuck that lawyer. 545-5800 that the lawyer I got that's the public defender they gave me. . . . Brandon gonna call Kendra's number tonight. He's gonna tell ya'll everything. You know what I'm saying. I told him we are gonna do whatever we can to help him on his case man so long as you know what I'm saying he do what he say he gonna do . . . He gonna call you all says he said he gonna send all his messages through you all to Kendra to me to tell ya'll what going on.

        . . . .

[Appellant]: Brandon ready to stand up and take responsibility for his actions. I told him me and my family do whatever we can to help him out. You know what I'm saying. I gave him Kendra's number I gave him Tony's number and all that, yeah man. So I told him we do whatever to help out. But that trying that Jimmy wanting to give him money to, Jimmy tried I told Brandon he didn't have to worry about paying his lawyer, he do what he what he say he gonna do and cut me loose he don't have to worry about paying his lawyer, we help him pay his lawyer.

Appellant testified that he merely wanted co-defendant Harris to admit that Appellant was not involved in the crime.

The State also introduced the testimony of Donovan Hensley, an employee of a local Jiffy Lube.[8] Mr. Hensley testified that Appellant and another man brought a white Dodge Charger to the Jiffy Lube in November of 2008 seeking installation of a new water pump. Jiffy Lube does not provide this service. Mr. Hensley identified Appellant in a photographic lineup on November 23, 2008, and again at trial.

Appellant presented an alibi defense. According to Appellant, he was at home enjoying a family fish fry and spaghetti on the night of the incident. After arriving around 6:45 p.m., Appellant ate dinner before watching two basketball games while laying on the floor on top of two "green cushions." Appellant reported that he slept on the floor that night.

Appellant acknowledged that he was in the white Dodge Charger at the Jiffy Lube with Derek Dowdy and that he drove the car on November 13 and 17, 2008. However, Appellant claimed that the car belonged to a crack user who pawned it someone who let Derek Dowdy use it for a while. Appellant attempted to explain each of his telephone calls, claiming that none of the telephone calls could be interpreted as instructions to people to kill Antonio Hawkins or influence witness testimony. In other words, Appellant claimed, as detailed above, that the statements he made during telephone calls were not related to the death of Antonio Hawkins but were made for other reasons. Appellant did admit that he changed his appearance for the preliminary hearing by picking his hair our and wearing glasses. However, Appellant stated that the trial court made him remove the glasses prior to the in-court identification by Antonio Hawkins. Appellant admitted that he had committed a string of eleven armed robberies when he was eighteen years old but again denied being involved in the incident for which he was on trial. Appellant stated that Derek Dowdy was the perpetrator.

Appellant's sister-in-law, Robin Saine, testified that she was home with Appellant on the night of the incident. She confirmed that the family ate fried fish and spaghetti for dinner. She testified that Appellant was asleep on the floor when she went to bed around 12:30 a.m. She remembered the details of the night vividly because Appellant's name came out in connection with the robbery the next day and she did not think that Appellant could have been involved because he was at home the time the robbery was committed. Ms. Saine admitted that she had several prior convictions for forgery and bad checks. Ms. Saine's recollection of the fish fry was confirmed by Appellant's brother, Tony Bohanna; Ricky

---

[8]During opening statements, counsel for the State stated that Appellant was involved in the robbery of a Jiffy Lube where the perpetrators drove a white Dodge Charger. Appellant objected. The trial court gave a curative instruction and instructed the State that it was refrained from mentioning the fact of the robbery.

-13-

Woodman, Appellant's long-time friend; Kendra Cannon, Appellant's sister; and Joseph Bohanna, Appellant's nephew.

Jurline Bohanna, Appellant's mother, also testified that Appellant was home on the night of the incident enjoying a family fish fry. According to Ms. Bohanna, Appellant arrived home around 7:00 p.m., ate dinner, and slept in the den. Ms. Bohanna admitted to talking to Appellant during his incarceration but denied plotting to influence witnesses, including asking witnesses to keep their story straight.

Courtney Lurry, the brother of co-defendant Harris testified that he knew Appellant, Jacob Halliburton, and Eric Walker. Mr. Lurry claimed that on the night of the incident he saw Mr. Halliburton and Mr. Walker at a basketball game. They were driving a white Dodge Charger and had driven it the entire month of November. Mr. Lurry was unable to remember the score of the basketball game or the name of the opposing team. Tony Bohanna also claimed that he saw Mr. Halliburton and Mr. Walker driving the white Charger.

Tony Bohanna acknowledged that he was the second person on the telephone during several of the telephone calls that were recorded by the jail. At least one of these telephone calls was about "hardware" or a pistol but Tony Bohanna did not recall telling Appellant not to worry about the location of the pistol. Tony Bohanna claimed that the gun referred to in the telephone call belonged to Trell Wright. Tony Bohanna also acknowledged that he threw away the pistol belonging to Mr. Wright because it was junk. Tony Bohanna also admitted that Appellant told him to tell Ms. Saine to "have her story straight." Tony Bohanna explained that Appellant just wanted her to tell the truth at trial. Tony Bohanna denied taking part in a conversation during which Appellant told him to "tell Trell to put that pistol on that boy" or where the second party exclaimed that he would "get on everything bro", despite the fact that Appellant testified that he was talking to his brother during these conversations. Tony Bohanna testified that he was unfamiliar with the gang slang terms "greased" or "blood in, blood out."

Myrico Carr testified that after the robbery he saw Mr. Halliburton or Mr. Walker wearing a watch that looked like the watch taken from Antoine Hawkins during the robbery. Mr. Carr told Antoine Hawkins about the watch. Mr. Carr also stated that there was another set of twins in the neighborhood.

Marilyn Harris, the mother of co-defendant Brandon Harris, testified that she saw two friends of her son driving a white Dodge Charger. She testified that she never saw her son in a white Charger. She did, however, acknowledge that Appellant and her son were friends.

At the conclusion of the trial, Appellant was found guilty of especially aggravated robbery, reckless endangerment as a lesser included offense of attempted second degree murder, one count of employing a firearm during the commission of a felony, and three counts of aggravated assault. Appellant was acquitted of one of the firearms charges. At a separate sentencing hearing, the trial court determined that Appellant was a career offender. The trial court imposed the maximum sentence for each offense and found that Appellant had an extensive criminal history and was a dangerous offender. The trial court ordered all the sentences to run consecutively, for a total effective sentence of 120 years, eleven months, and twenty-nine days. Appellant filed a timely motion for new trial which the trial court denied.

Appellant appealed. The following issues are presented for our review: (1) the sufficiency of the evidence; (2) the admission of evidence pursuant to the forfeiture by wrongdoing provision of Tennessee Rule of Evidence 804(b)(6); (3) the admission of Appellant's jailhouse telephone calls; (4) the determination by the trial court to hold court on Sunday; (5) the denial of Appellant's motions for mistrial; (6) the admission of the testimony of Donovan Hensley; and (7) the imposition of consecutive sentencing.

*Analysis*
*A. Forfeiture by Wrongdoing*

First, Appellant argues that the trial court incorrectly determined that Antonio Hawkins was unavailable for the purposes of admission of his prior testimony and that hearsay statements of Antonio Hawkins were admissible pursuant to the hearsay exception in Tennessee Rule of Evidence 804(b)(6). The State insists that Appellant is not entitled to relief.

Prior to trial, Antonio Hawkins, the only victim to positively identify Appellant as one of the perpetrators, was murdered. The State filed a motion to admit statements made by Antonio Hawkins to others about Appellant's involvement in the crime pursuant to Tennessee Rule of Evidence 804(b)(6).[9] This rule of evidence allows the admission of hearsay statements "against a party that has engaged in wrongdoing that was intended to and did procure the unavailability of the declarant as a witness." *Id.* The State, after reviewing jailhouse telephone calls made by Appellant, was under the impression that Appellant had knowledge of or was involved in the murder of Antonio Hawkins. Appellant opposed this motion. After a lengthy hearing that took place over several days, the trial court determined that the statements were admissible pursuant to Tennessee Rule of Evidence 804(b)(6).

---

[9]Neither party contested the admissibility of the victim's preliminary hearing testimony or the determination that the witness was unavailable.

As recounted in the factual background section, at the hearing prior to trial the State presented the testimony of Sergeant Merritt and Adrian Wright.[10] At the hearing, Sergeant Merritt testified that Antonio Hawkins was killed after leaving a Sleep Inn Motel and that his body was found at a home on Grandberry. Sergeant Merritt also testified that there was blood left at the house that was found to match someone named Charles Townsend. Mr. Wright, housed in the jail with Appellant and on the same pod with Appellant from July of 2009 to January of 2010 described Appellant as "excited" and "happy" when he learned about Antonio Hawkins's murder. Appellant even told Mr. Wright that it was a "done deal" carried out by Little Dee and Little Charles. Mr. Wright also claimed that Appellant told him he was using someone else's pin number to make telephone calls from the jail during the time he was setting up the murder.

After hearing the testimony, the trial court noted that Mr. Wright's testimony about Appellant's statements about the murder included information that, as established by the testimony of Sergeant Merritt, would have been known only by someone involved in the crime. The trial court also considered Appellant's jail telephone calls where he "encouraged people to get people to disappear, to get people high, to get people drunk, to encourage people not to come to court, to put guns on witnesses . . . ." The trial court noted that both parties stipulated to Antonio Hawkins's unavailability. Next, the trial court determined that Appellant had "for a number of years engaged in the process to keep this witness, Mr. Hawkins, from testifying." The trial court pointed to numerous recorded conversations during which Appellant wanted someone to encourage witnesses to change their testimony and prevent Antonio Hawkins and others from testifying. The trial court determined Appellant had utilized "potential bribery, coercion, getting people high, giving people money, having witnesses concoct stories, . . . ." The trial court determined that there was clear and convincing evidence that Appellant had something to do with Antonio Hawkins's unavailability to testify at trial and that the probative value of the evidence was outweighed by the potential prejudice. In fact, the trial court ruled that it would be a "miscarriage of justice" to exclude the testimony. In conclusion, the trial court opined:

> Mr. Hawkins is, in fact, unavailable and that [Appellant's] actions were in part to prevent Mr. Hawkins from being in Court as a witness, and the Court does find through forfeiture by wrongdoing, 804(b)(6), that those statements, those facts, those allegations, should the State choose to proceed, would, in fact, be admissible, and any statements that Mr. Hawkins may have specifically made, most of those statements have, in fact, been subject to cross-examination, but

---

[10]Interestingly, the State contends that the portion of the hearing during which Adrian Wright testified is missing from the record. To the contrary, Adrian Wright's testimony is found in Volume 26 of the record along with the ruling from the trial court on the issue.

any statements that Mr. Hawkins may have specifically made are an exception to hearsay, the Court having ruled that his presence is - - he is not present because of actions of [Appellant] and those actions were in part designed to make sure that Mr. Hawkins would not appear in Court and those actions . . . ultimately accomplished that goal, and the Court will allow those statements by Mr. Hawkins to be admitted as an exception to hearsay under the forfeiture by wrongdoing [exception].

Rule 801(c), defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Rule 802 states that "hearsay is not admissible except as provided by these rules or otherwise by law." Tenn. R. Evid. 802.

In *State v. Ivy*, 188 S.W.3d 132 (Tenn. 2006), the court determined that the following principles apply to the application of the so-called forfeiture by wrongdoing exception: (1) the rule does not limit the subject matter of the statements; (2) the rule is not limited to statements made when a formal charge or judicial proceeding is pending against the defendant; (3) the trial court must conduct a jury-out hearing to determine whether statements are admissible; (4) the trial court must find that a preponderance of the evidence establishes "that the defendant was involved in or responsible for procuring the unavailability of the declarant"; and (5) the trial court must find that a preponderance of the evidence establishes "that a defendant's actions were intended, at least in part, to procure the absence of the declarant." 188 S.W.3d at 147. This exception does not contradict with a defendant's rights under the Confrontation Clause. *Id.*; *see also Giles v. California*, 554 U.S. 353 (2008).

The trial court herein followed the procedure set forth in *Ivy* and concluded that Appellant played some role in Hawkins' murder with a view toward preventing Hawkins from testifying about the incident for which Appellant was incarcerated. 188 S.W.3d at 147. As noted above, the subject matter of the statements is not limited by the rule, and the statements do not have to relate to formal charges or judicial proceedings pending against the defendant. *Id.* In this case, the trial court properly conducted a hearing to determine whether statements were admissible and found that a preponderance of the evidence established "that the defendant was involved in or responsible for procuring the unavailability of the declarant"; and "that a defendant's actions were intended, at least in part, to procure the absence of the declarant." *Id.* The evidence does not preponderate against the findings of the trial court. Appellant is not entitled to relief with respect to this issue.

-17-

## B. Discovery Complaint

Next, Appellant argues that the trial court erred by failing to grant his request for *Jencks* material from Sergeant Merritt and for not granting his request for discovery of police reports in the Antonio Hawkins murder case. The State proposes that Appellant is not entitled to relief because this issue was not raised in a motion for new trial and is, therefore, waived on appeal. We agree. Tennessee Rule of Appellate Procedure 3(e) provides, in pertinent part:

> [I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.

Appellant did not raise this issue in his motion for new trial. This issue is waived.

## C. Jail Telephone Calls

As detailed above, prior to trial, the trial court granted the State's motion to admit recordings of ten of Appellant's jailhouse telephone calls as admissions against Appellant's penal interest, evidence of witness tampering, and to show guilty knowledge of the crime. On appeal, Appellant claims that the trial court erred in allowing at least five of the taped jailhouse telephone calls into evidence to "show common or ongoing scheme or guilty knowledge" because the probative value of the telephone calls was outweighed by the danger of unfair prejudice and there was "no clear connection between the conversations on the calls and the case at trial." The State argues that the trial court did not abuse its discretion and properly followed the procedure for admission of the evidence pursuant to Tennessee Rule of Evidence 404(b).

The general rule is that evidence of a defendant's prior conduct is inadmissible, especially when previous crimes or acts are of the same character as the charged offense, because such evidence is irrelevant and "invites the finder of fact to infer guilt from propensity." *State v. Hallock*, 875 S.W.2d 285, 290 (Tenn. Crim. App. 1993). Tennessee Rule of Evidence 404(b) permits the admission of evidence of prior conduct if the evidence of other acts is relevant to a litigated issue such as identity, intent, or rebuttal of accident or mistake, and the probative value outweighs the danger of unfair prejudice. Tenn. R. Evid. 404(b), Advisory Comm'n Cmts.; *See State v. Parton*, 694 S.W.2d 299, 303 (Tenn. 1985); *State v. Hooten*, 735 S.W.2d 823, 824 (Tenn. Crim. App. 1987). However, "[e]vidence of

other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Before admitting evidence under Rule 404(b), the rule provides that (1) upon request, the court must hold a hearing outside the jury's presence; (2) the court must determine that the evidence is probative on a material issue and must, if requested, state on the record the material issue and the reasons for admitting or excluding the evidence; (3) the court must find proof of the other crime, wrong, or act to be clear and convincing; and (4) the court must exclude the evidence if the danger of unfair prejudice outweighs its probative value. Tenn. R. Evid. 404(b).

In this case, Appellant specifically complains about the admission of telephone calls from March 18, March 24, November 26, December 25, and January 5. The November 26 phone call in which Appellant stated that he needed "Trell to put that pistol on that boy" was found to be relevant by the trial court as to consciousness of guilt and an attempt to suppress the evidence. The trial court ruled that the December 25 telephone call during which Appellant wanted to know the whereabouts of the "hardware" was relevant to the issue of consciousness of guilt and showed effort on Appellant's part to suppress both witnesses and evidence. The January 5 phone call where Appellant discussed his intent to change his appearance at the preliminary hearing so as to be unrecognizable relevant to consciousness of guilt and identity. The March 18 telephone call about co-defendant Harris's mother and inquiring about witnesses keeping their "story straight" was deemed by the trial court as relevant to show an attempt to suppress evidence, or intimidate a witness. The March 24 phone call in which Appellant discussed the possibility of paying co-defendant's lawyer fees was determined by the trial court to indicate a consciousness of guilt.

As detailed above, the admission of evidence is discretionary. *Banks*, 271 S.W.3d at 116. The trial court employed an analysis under Tennessee Rule of Evidence 404(b), finding the evidence more probative than prejudicial. The trial court did not abuse its discretion. Appellant is not entitled to relief.

### D. Testimony of Donovan Hensley

In his last evidentiary issue, Appellant argues that the trial court erred in admitting the testimony of Mr. Hensley. Specifically, Appellant claims it was error to enter the testimony of Mr. Hensley after the prosecutor's comments during opening statements that alleged the white Dodge Charger Appellant was seen driving was also used at a robbery at a local Jiffy Lube in close proximity to the time of the robbery of the Hawkins twins. The State disagrees.

During opening statements, counsel for the State commented that Donovan Hensley, an employee of Jiffy Lube, would testify that Appellant and another individual drove to the

Jiffy Lube in a white Dodge Charger, asked about changing a water pump, then robbed the Jiffy Lube. Counsel for Appellant asked for a mistrial and objected to the statements of counsel. The trial court immediately issued a curative instruction. Counsel for Appellant asked the trial court to prohibit Mr. Hensley from testifying because his testimony would only serve to remind jurors of the statements made by counsel in opening. The trial court denied the request to strike Mr. Hensley from the witness list, noting that he would be prohibited from testifying about the robbery and would testify only that Appellant brought a white Dodge Charger in for service. The trial court then gave the jury a second curative instruction.

As stated above, the admission of relevant evidence is discretionary. *Banks*, 271 S.W.3d at 116. The testimony of Mr. Hensley was certainly relevant, as it showed a connection between Appellant and the white Dodge Charger used in the crime that was unrelated to the incident itself. The trial court cured any prejudice to Appellant that occurred after opening statements by issuing not one, but two curative instructions to the jury. Appellant is not entitled to relief on this issue.

### *Denial of Mistrial*

Appellant moved for a mistrial several times during the lengthy trial. The trial court denied the motion in each instance. We will review each scenario below.

The purpose of a mistrial is to correct the damage done to the judicial process when some event has occurred which would preclude an impartial verdict. *See Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). The decision whether to grant a mistrial is within the trial court's discretion and will not be disturbed absent an abuse of that discretion. *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991) (citing *State v. Hall*, 667 S.W.2d 507, 510 (Tenn. Crim. App. 1983)). For this reason, an appellate court's review should provide considerable deference to the trial court's ruling in determining whether an occurrence or event at trial has so prejudiced the defendant or the State as to preclude a fair and impartial verdict. *See State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

In determining whether there is a "manifest necessity" for a mistrial, "'no abstract formula should be mechanically applied and all circumstances should be taken into account.'" *State v. Mounce*, 859 S.W.2d 319, 322 (Tenn. 1993) (quoting *Jones v. State*, 403 S.W.2d 750, 753 (Tenn. 1966)). Only when there is "no feasible alternative to halting the proceedings" can a manifest necessity be shown. *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981).

## A. Remark by Prospective Juror

Appellant complains that he was entitled to a mistrial based on the trial court's refusal to strike the entire jury pool after a prospective juror explained that her father, a jailer, thought that "everybody that's black, Hispanic, they're all guilty and that's it, in a nutshell." The trial court dismissed the juror, commenting that the remark was probably made to avoid jury duty and gave a curative instruction to the remaining jury pool. The State contends that the trial court did not abuse its discretion. We agree. After carefully reviewing the facts pertinent to this issue we conclude that there existed no manifest necessity to declare a mistrial. As noted above, a manifest necessity exists only when there is "no feasible alternative to halting the proceedings." *Knight*, 616 S.W.2d at 596. In the case before us, the trial court commented to the remaining jury pool that the juror probably made the comment to avoid jury duty. He gave a curative instruction to the jury pool. All of the remaining potential jurors indicated affirmatively that they would be capable of forming an unbiased opinion as to Appellant's innocence or guilt. As such, there was no reason to interrupt the trial court's proceedings, and it was well within the trial court's discretion to deny the request for a mistrial. Appellant is not entitled to relief on this issue.

## B. Opening Statement Reference to Prior Bad Act

As mentioned above during the discussion about the admissibility of Mr. Hensley's testimony, Appellant complained about the prosecutor's claim during opening statements that Mr. Hensley would testify that Appellant was seen in a white Dodge Charger that was used at a robbery at Jiffy Lube. In response to the argument, counsel for Appellant moved for a mistrial. The trial court denied a mistrial but gave the jury a lengthy curative instruction.

Opening statements "are intended merely to inform the trial judge and jury, in a general way, of the nature of the case and to outline, generally, the facts each party intends to prove." *Harris v. Baptist Mem'l Hosp.*, 574 S.W.2d 730, 732 (Tenn. 1978). "Trial courts have wide discretion in controlling arguments of counsel, including opening statements, and a trial court's ruling concerning the arguments of counsel will not be reversed absent an abuse of discretion." *State v. Stacy Johnson*, No. W2004-00464-CCA-R3-CD, 2005 WL 645165, at *15 (Tenn. Crim. App., at Jackson, Mar. 15, 2005), *perm. app. denied*, (Tenn. Aug. 29, 2005) (citing *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978)). We are unable to find "manifest necessity" for a mistrial based on the prosecutor's comments. The prosecutor was attempting to tell the jury what she expected the proof to show. As we noted above, after the objection the trial court carefully and thoroughly instructed the jury that they could not consider any statements by counsel as evidence and to disregard the statement. A jury is presumed to follow a trial court's instructions. *Millbrooks*, 819 S.W.2d at 443. Accordingly, we do not believe the prosecutor's comments caused the jury to convict

Appellant based on other alleged robberies during which Appellant rode in or drove the white Dodge Charger. Under these circumstances, we do not think that the trial court abused its discretion when it determined that there was no "manifest necessity" for a mistrial. Appellant is not entitled to relief on this issue.

### C.  Sleeping Juror

Appellant insists that the trial court should have granted a mistrial when four jurors fell asleep during closing argument. At trial, following the completion of closing arguments, the trial court informed both parties that one juror, Mr. Gray, was asleep during argument. The trial court offered to excuse Mr. Gray from jury duty and replace him with an alternate. Appellant declined this offer, stating that because Mr. Gray was African-American, he would prefer that the trial court simply prefer that trial court randomly draw a number. Appellant then informed the trial court that four jurors were sleeping. The trial court disagreed, pointing out that the court had closely watched the jurors during argument and did not see any other juror sleeping. Appellant offered to provide affidavits of family members who saw the jurors sleeping but there are no affidavits in the record.

The trial court did not abuse its discretion in denying a mistrial. The trial court offered to excuse the one juror the trial court witnessed sleeping. Appellant declined. We are unable to find "manifest necessity" for a mistrial based on the facts as presented. Appellant is not entitled to relief.

### Conducting Court on Sunday

Appellant argues that the trial court erred by conducting trial on Sunday. Specifically, he insists that counsel for Appellant informed the trial court that he had witnesses who would attend church and would miss church if required to come on Sunday. Additionally, Appellant pointed out that it was Super Bowl Sunday and the jury had not been polled as to whether they wanted to work on Sunday. The trial court held court on Sunday. The State finds no error.

"In general, the course and conduct of trial proceedings rests within the sound discretion of the trial court." *State v. King*, 40 S.W.3d 442, 449 (Tenn. 2001) (citing *State v. Cazes*, 875 S.W.2d 253, 260 (Tenn. 1994)). In that decision the Court rejected a per se rule invalidating Sunday Court proceedings. The Court held whether to conduct court proceedings on a Sunday rests within the discretion of the trial court. The Court went on to hold:

-22-

In exercising this discretion, the trial court should be deferential to the preferences of the litigants, witnesses, jurors, and attorneys and must be mindful of the need for every participant in a trial proceedings to be prepared and rested. The trial court must also respect and accommodate the genuinely-held religious view of any litigant, witness, juror, or attorney. Finally, the trial court must weigh all of these concerns against whatever pressing need or compelling interest may necessitate a Sunday proceeding.

*Id.* at * 8.

In the case herein, the trial had been going on for several days; the jury had been sequestered. Around 6:45 p.m. on Saturday night, the jury indicated that they needed a break from testimony. At that point, Appellant had five more witnesses that he wanted to put on the stand that night because they were people that went to church. The trial court spoke directly to the witnesses and proposed getting the jury to dinner and the hotel and resuming testimony on Sunday. None of the witnesses voiced concern. Appellant did not voice any concerns. When the trial resumed on Sunday, Appellant objected to court on Sunday because of the Super Bowl. The trial court noted that the jury was sequestered, the case had lasted longer than the jury was originally told, and the jury expressed frustration about the length of the trial. The trial resumed. At around 2:00 p.m., Appellant rested his case. The trial court gave the jury the option to finish for the day or begin deliberations. The jury chose to proceed. Under these circumstances, we find no abuse of discretion in conducting Sunday court proceedings. This issue is without merit.

*Sufficiency of the Evidence*

Appellant argues on appeal that the evidence is insufficient to support his convictions. Specifically, Appellant insists that the only evidence of his guilt that was properly admitted during trial was the preliminary hearing testimony of Antonio Hawkins and this testimony merely confirmed that the perpetrator was "a guy resembling [Appellant]." In other words, absent the evidence the trial court admitted pursuant to the forfeiture by wrongdoing exception to the hearsay rule, there is not enough evidence of guilt to support the convictions, especially in light of Appellant's alibi defense. The State contends that the evidence was properly admitted by the trial court and, even if it were improperly admitted, the preliminary hearing testimony of Antonio Hawkins coupled with the rest of the testimony at trial, provided sufficient proof for the jury to convict Appellant of the crimes.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses

and resolves all conflicts in the testimony in favor of the State. *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994); *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. *Id.* The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *Se*e Tenn. R. App. P. 13(e); *Harris*, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *See Tuggle*, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Appellant presents several arguments attacking specific evidence from trial. He argues the following testimony was the only testimony to prove his guilt and that it was improperly admitted: (1) Michael Reynolds's testimony that Antonio Hawkins told him that the robbery was committed by men driving a white Dodge Charger; (2) John Morgan's testimony that Antonio Hawkins told him he saw Appellant enter the home with a pistol and told him to "get his bitch ass on the ground"; (3) John Morgan's identification of Appellant based on what Antonio Hawkins told John Morgan about the crime; (4) John Morgan's testimony that Antonio Hawkins told him that the robbery was committed by men driving a white Dodge Charger; (5) Antoine Hawkins's testimony that his brother told him Appellant committed the crimes; (6) Sergeant Tutt's testimony wherein he read his written summary of the interview conducted with Antonio Hawkins; (7) the written summary of the interview with Antonio Hawkins; (8) Vita Zelikov's written summary of her interview with Antonio Hawkins; (9) the testimony of Vita Zelikov with respect to her investigation; (10) Lieutenant Kee's testimony about Antonio Hawkins's identification of Appellant as the perpetrator; (11) the photo spread; and (12) the written statement of Antonio Hawkins. Without this testimony, Appellant contends that there is insufficient proof to sustain the convictions.

Especially aggravated robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" where the culprit uses a deadly weapon and causes seriously bodily injury to the victim. T.C.A. § § 39-13-401(a), -403(a). To support Appellant's conviction for aggravated assault, the State was required to prove that Appellant knowingly caused bodily injury to the victim by using a deadly weapon pursuant to Tennessee Code Annotated sections 39-13-101(a)(1) and -102(a)(1)(B). To sustain a conviction for aggravated burglary as charged in the indictment, the State must prove that Appellant entered a habitation without the effective consent of the property owner and with the intent to commit theft. T.C.A. § 39-14-402, -403. Under Tennessee's reckless endangerment statute, "[a] person commits an offense who recklessly engages in conduct which places or may place another person in imminent danger of death or serious bodily injury." T.C.A. § 39-13-103(a). A person acts recklessly "when the person is aware of but consciously disregards a substantial and unjustifiable risk." T.C.A. § 39-11-302(c). That "risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint." *Id.*

As detailed above, we find no error in the trial court's admission of the challenged evidence. Appellant's arguments with regard to the sufficiency of the evidence are all based upon factual issues presented to the jury. As stated above, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *Pruett*, 788 S.W.2d at 561. The issues raised by Appellant would require us to determine the credibility of the witnesses and the factual issues raised by the evidence presented. Such a decision is not this Court's role on appeal. As stated above, our role on appeal is to draw all reasonable inferences from the evidence in favor of the State. *Cazes*, 875 S.W.2d at 259; *Harris*, 839 S.W.2d at 75.

We now review the evidence to determine whether a reasonable jury could find Appellant guilty of especially aggravated robbery, aggravated burglary, aggravated assault, reckless endangerment, and employing a firearm during the commission of a felony. Looking to the evidence in a light most favorable to the State, Appellant was identified numerous times at the preliminary hearing by Antonio Hawkins as one of three men who entered his home armed with a gun, without permission, and robbed and shot his brother, nearly killing him. A white Dodge Charger was seen parked across the street from the home and was gone when the perpetrators left the scene. Appellant admitted that he drove a white Dodge Charger for a period of time several days prior to the offenses herein. Additionally, Mr. Hensley confirmed that Appellant and another man brought a white Dodge Charger to the Jiffy Lube in November of 2008. Finally, Mr. Morgan testified at trial that Appellant was

-25-

taller than six feet, one inch. The record in this case established that Appellant was six feet, three inches tall. The jury heard and, based on their verdict, dismissed the alibi provided by Appellant. A decision within their purview. We conclude that the evidence was sufficient to support Appellant's convictions.

*Sentencing*

Appellant argues that the trial court erred in ordering his sentences to be served consecutively. The State disagrees.

Appellate review of sentencing is for abuse of discretion. We must apply "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *See State v. Bise*, 380 S.W.3d 682, at 707 (Tenn. 2012).

In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, first determines the range of sentence and then determines the specific sentence and the appropriate combination of sentencing alternatives by considering: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts regarding sentences for similar offenses; (7) any statements the defendant wishes to make in the defendant's behalf about sentencing; and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-210(a), (b), -103(5); *State v. Williams*, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995).

The trial court is still required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. *See Bise*, 380 S.W.3d at 705 n. 41; *State v. Samuels*, 44 S.W.3d 489, 492 (Tenn. 2001). Thus, under *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10.

*Consecutive Sentences*

Under Tennessee Code Annotated section 40-35-115(a), if a defendant is convicted of more than one offense, the trial court shall order the sentences to run either consecutively

or concurrently. A trial court may impose consecutive sentencing upon a determination that one or more of the criteria set forth in Tennessee Code Annotated section 40-35-115(b) exists. This section permits the trial court to impose consecutive sentences if the court finds, among other criteria, that:

> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> . . . .
>
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high; . . . .

T.C.A. § 40-35-115(b)(2), (4). When imposing a consecutive sentence, a trial court should also consider general sentencing principles, which include whether or not the length of a sentence is justly deserved in relation to the seriousness of the offense. *See State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002). The imposition of consecutive sentencing is in the discretion of the trial court. *See State v. Adams*, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997).

Appellant argues that the trial court erred in imposing consecutive sentences by only considering Appellant's prior aggravated robbery convictions and that is not sufficient to make Appellant a dangerous offender for purposes of consecutive sentencing. The trial court based the imposition of consecutive sentences on factor (2), "the defendant is an offender whose record of criminal activity is extensive, . . . " and (4), "the defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high; . . . ."

As stated above, this section also permits the trial court to impose consecutive sentences if the court finds, among other criteria, that "the defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(b)(4). However, before ordering the defendant to serve consecutive sentences on the basis that he is a dangerous offender, the trial court must find that the resulting sentence is reasonably related to the severity of the crimes, necessary to protect the public against further criminal conduct, and in accord with the general sentencing principles. *See State v. Imfeld*, 70 S.W.3d 698, 708-09 (Tenn. 2002); *State v. Wilkerson*, 905 S.W.2d 933, 938-39 (Tenn. 1995).

In the case at hand, the trial court did made extensive findings based on *Wilkerson* prior to applying consecutive sentencing based upon Appellant being a dangerous offender. The trial court noted that Appellant had never held a job, had a previous history of violent crime, and had no hesitation about engaging in another crime where the threat of death was imminent. The trial court noted that this was certainly a "situation[ ] where the risk to human life [was] high and . . . almost caused Antoine Hawkins his life." The trial court further determined that had Appellant been incarcerated rather than being released, "these folks would not have been robber." The trial court stated that if consecutive sentences were not warranted in Appellant's case "they are not warranted for anyone." At the time of the incident, Appellant was thirty-two. Appellant had prior convictions for ten aggravated robberies that occurred on the same day at three separate businesses. Appellant admitted to a history of drug use as well as two juvenile adjudications for aggravated robbery. Appellant also had other juvenile adjudications, beginning approximately at the age of eleven and a number of additional adult convictions that were not used to enhance Appellant's sentencing range. We agree with the trial court that this is an extensive criminal history. Further, this record demonstrates that Appellant has a clear disregard for the law. We conclude that this is sufficient proof of Appellant as a dangerous offender with an extensive criminal activity to support the imposition of consecutive sentences. Appellant is not entitled to relief.

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
JERRY L. SMITH, JUDGE